433 So.2d 251 (1983)
William L. BOWMAN
v.
Victor E. COURSEY, Jr., Lake Sherwood Acres, Inc., V E C Corporation.
No. 82 CA 0075.
Court of Appeal of Louisiana, First Circuit.
May 17, 1983.
Rehearing Denied June 29, 1983.
William H. Cooper, Baton Rouge, for plaintiff-appellant William H. Bowman.
Robert A. Hawthorne, Jr., Baton Rouge, for defendants-appellees Victor E. Coursey, Jr., Lake Sherwood Acres, Inc., and V E C Corporation.
Before COVINGTON, LEAR and LANIER, JJ.
LEAR, Judge.
William Bowman was hired by Victor E. Coursey, Jr. to design various buildings, among them a warehouse to be located in Jefferson Parish, Louisiana. Bowman filed suit against Coursey, V E C Corporation and Lake Sherwood, Inc. for payments allegedly due him on an open account. Defendants Coursey and V E C reconvened, alleging that Bowman's design for the warehouse project "was not done with the skill usually exercised by others in his profession in the same general area." With respect to the main demand, a joint motion and stipulation was entered by all parties to the effect that Bowman had been paid all fees due him for engineering services rendered on behalf of Coursey, V E C and Lake Sherwood Acres, Inc. A trial was held on the reconventional demand and judgment was rendered in favor of the plaintiffs-in-reconvention in the amount of $51,133.36 for damages. Defendant-in-reconvention herein appeals.
Bowman's original plans for the warehouse project including pilings beneath the walls and the floor slab. Because Mr. Coursey expressed a desire to reduce the cost of the project, the plans were revised and it was decided to build the warehouse without pilings beneath the floor area. Mr. Bowman alleges that at the time the revisions were made Mr. Coursey was told that as a result of the revisions the floor area would *252 be subject to some settlement. Mr. Bowman testified that Mr. Coursey asked various questions concerning how long it would take for the expected settlement to manifest itself and, once it occurred, how the settlement could best be handled. At this time Mr. Bowman also consulted with the soils engineer and with the engineer employed by the lending institution, State Mutual Life Insurance Company. As a result of the revision in the design they requested that Bowman strengthen and reinforce the floor slab to minimize the effect of any settlement that would occur. In addition, the revised plans were submitted to and approved by the Jefferson Parish Building and Regulatory Board.
Construction was begun and was to be completed by September of 1978. However, when the warehouse was approximately twenty-five percent complete, it was discovered that there may be problems with the quality of the construction work. Inspectors called to the site were extremely critical of the wall construction and, in addition, indicated that there may be problems with the design for the foundation. A preliminary report submitted by Charles Perrault, a consulting engineer, stated "In addition to the wall problems we foresee problems in the floor slab if the slab is not pile supported which in turn could also cause problems in the wall foundation because of downdrag on the pile supporting the wall and possibly some lateral movement of the soil."
At this time construction was halted and a series of meetings was held. It was decided to employ additional engineers who would review all reports submitted up to this time, conduct additional testing if required and make recommendations. The main dispute centered around whether or not Bowman had, or should have, considered downdrag or negative skin friction in determining the capacity of the piles beneath the wall area. Coursey's people felt that, because the floor area would not be piled, the piles beneath the wall would be subject to downdrag, and therefore it would be necessary for the piles beneath the walls to be able to carry additional tonnage. A concensus as to how to proceed with the building was never reached. No work has been done on the warehouse since the October 1978 shutdown.
Mr. Charles Perrault, a structural engineer, was called in as a consultant when it was suspected there may be problems with the construction of the warehouse walls. He testified that when the pilings were removed from beneath the floor area of the warehouse, there developed a need for additional piling support beneath the walls, due to the effect of downdrag or negative skin friction. He felt that because this factor was not taken into consideration there would be excessive settlement in the slab, and this would have some bearing on the performance of the walls over a long term course. He stated that due to the anticipated settlement, he could not tell his client, State Mutual Life Insurance Company, that the pilings were sufficient. However, he could not say that the design was necessarily wrong.
G. Edmund Schrenk, a consulting engineer specializing in structural design, stated in deposition that he was called in to look at the foundation of the warehouse and determine whether the piling was sufficient and the floor system would serve effectively. He felt that the soils report indicated that they would "get a lot of settlement, not a failure but a lot of settlement." When asked whether or not the building was acceptable from an engineering standpoint, he stated that he would advise the owner that he had only a certain percentage of the safety factor required, but he did not think that the building was inadequate.
Edward R. Morphy, a consulting civil engineer, testified that as a result of downdrag there was a possibility of large soil-related settlements and that the owner needed to be advised of this fact. However, rather than state an opinion as to whether or not the foundation design was acceptable or unacceptable, he simply reiterated his earlier statement that the possibility of settlement was something the owner should be made aware of.
*253 Dean C. McKee, a structural engineer who was called as a witness for Mr. Coursey, testified that he felt the piles beneath the interior walls were insufficient to meet the requirements of the soil testing report. However, he did not foresee any danger of the building falling or becoming seriously impaired from a structural standpoint. He felt that there would be movement in the slab and therefore there was a possibility of cracking in the walls, but there was also a possibility of the design "operating successfully."
Larry D. Jones, a structural engineer called as Bowman's witness, testified that in substance he agreed with Bowman's design and he thought that the design was adequate. He testified that if he were designing the building he may or may not have considered the effect of the downdrag or negative skin friction. However, because he was called in to determine whether or not the project could go forward as designed, he simply made calculations using the plans and from this he concluded that the project could go forward as designed. Although he stated the very best design would be to "pile everything", as long as Coursey knew what he was getting, allowing the floor to float was not a bad condition. He did feel that there would be settlement; however, it would occur in a controlled fashion due to the stiffness of the walls, and therefore, it would not stress the building in a manner that would be unacceptable to the owner.
One practicing a learned profession must do so with a degree of professional care and skill customarily employed by others of the same profession in the same general area. This standard has been held applicable to engineers. Calandro Development, Inc. v. R.M. Butler Contractors, Inc., 249 So.2d 254 (La.App. 1st Cir.1971); Pittman Construction Company v. City of New Orleans, 248 La. 434, 178 So.2d 312 (La.App. 4th Cir.), application denied, 248 La. 433, 179 So.2d 274 (1965).
Mr. Coursey argues that the design is sub-standard and would result in settlement of the floor and possibly cracking in the walls, and therefore, Mr. Bowman should be liable for damages. A careful reading of the record convinces us of the following: first, if the warehouse were to be built according to the revised plans, it would be a less than perfect building; and, second, the imperfections would not be due to a breach by Mr. Bowman of the standard of professional care imposed upon him, but rather to the fact that Mr. Coursey preferred the imperfections to further financial outlays.
Mr. Coursey testified that initially he asked Mr. Bowman if there was a less expensive way of designing the warehouse, he was told that the floor could be arched such that when settlement occurred it would not be very pronounced. The revised plans were taken to the lending agency who submitted suggestions for a different type of construction for the floor. Mr. Bowman was then directed to revise the plans a second time according to the suggestions given by the lending agency.
Mr. Bowman testified that at the time the design changes were made he told Mr. Coursey that there would be settlement of the floor. Mr. Coursey's response was that he could live with the settlement. Charles Perrault, a witness called by Mr. Coursey, corroborated Mr. Bowman's testimony regarding the fact that Mr. Coursey knew that as a result of removing the piles from beneath the floor there would be settlement.
All of the witnesses who testified generally agreed that additional pilings were necessary in order to prevent settlement, but none would say that the design was clearly wrong or engineeringly unsound. There was no evidence that the design violated the Jefferson Parish Building Code, nor was there any testimony from the experts that the warehouse if built as planned would present a danger or hazard to persons working within it. The problems that may manifest themselves once the building is completed are problems that Mr. Coursey has stated he is willing to accept in exchange for a reduction in the building expenses, therefore, he cannot now complain.
*254 The trial court found that the design was altered and the pilings beneath the floor were removed at the insistence of Mr. Coursey in order to cut building expenses, and that Mr. Coursey's decision was made with the full knowledge that the changes would result in settlement of the floor. Nevertheless, the court ruled that Mr. Bowman's second design was defective due to the fact that he did not compensate for the removal of the piles beneath the floor by utilizing extra piles beneath the walls. Since the evidence presented at the trial established the design was altered at the insistence of Mr. Coursey with full knowledge of the potential for floor settlement, the ruling of the trial court is clearly wrong, and we reverse. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
For these reasons the judgment of the trial court is reversed. Costs are to be paid by appellees.
REVERSED.