448 So.2d 858 (1984)
T.W. ALLEY, Sr., Plaintiff-Appellee,
v.
Thomas COURTNEY, Jr., Defendant-Appellant.
No. 16138-CA.
Court of Appeal of Louisiana, Second Circuit.
March 26, 1984.
Writ Denied May 11, 1984.
*859 Davis & Davis by Robert S. Davis, Shreveport, for defendant-appellant.
Smitherman, Lunn, Chastain & Hill by Richard S. Schmidt, Shreveport, for plaintiff-appellee.
Before MARVIN, JASPER E. JONES and SEXTON, JJ.
MARVIN, Judge.
A professional construction appraiser and inspector appeals a $13,240 judgment against him for damages arising out of a bank's reliance upon two inspection reports which were found to have erroneously stated that a particular residence under construction on each of two lots had been "completed" to the stage of "first inspection."
The trial court found that "a preponderance of the evidence reveals that the work on these lots had not progressed to the point where the slab could be poured and had not reached a point where a proper first inspection certificate should have been issued." We find that the evidence supports this finding and affirm.
This record establishes that in the Shreveport-Bossier residential construction industry, completion to the stage of "first inspection" means that preparations have been madethe lot has been graded, underground utilities have been roughed in, beams and forms for the foundation have been dug and built, and the waterproof membrane and supporting steel have been installedfor the pouring of the concrete that will complete the foundation of the residence.
It is also established that professionals such as defendant are hired to make appraisals and periodic inspections upon which builders rely to obtain working capital and upon which interim and permanent lenders rely to make loans and advances to builders. The amount loaned on the first inspection varies from lender to lender and ranges from about 20 percent to about 30 percent of the appraised value of the house and lot upon final completion. Some lenders may lend 25 percent of the appraisal on first inspection while others may lend a percentage of a percentage of the appraisal. The bank in this instance loaned 40 percent of 75 percent of the appraisals to this builder and others as a customary practice. Defendant was experienced and was well acquainted with the industry and served numerous lenders in the area as well as the FHA and the VA. He knew *860 that the builder and the bank would rely on his inspection reports.
After the builder ceased construction, defaulted on the loans, and took bankruptcy, and about six months after defendant made his first inspection reports, photographs of the lots were taken. These photographs generally corroborate the preponderance of the testimony that the foundation stage of construction on each lot had not been 95 percent completed when defendant made his reports, as defendant urged and testified. Estimates of most witnesses ranged from 15 to 50 percent of first inspection completion on one lot and from 30 to 60 percent on the other. Defendant and one other witness, who relied heavily on what defendant had told him and who belatedly made his inspection, testified that the first inspection stage was 95 percent complete when defendant wrote his reports. The trial court discounted this testimony and accepted instead the testimony of plaintiff's witnesses. This is the prerogative of a trier of fact and our review convinces us that the trial judge did not abuse the discretion afforded him.
Defendant argues that the bank relied on the continuing guarantee of plaintiff and not on the inspection reports. The trial court concluded to the contrary, accepting the testimony of the loan officer of the bank. The record supports the statement of the trial court that had the loan officer known that construction had not reached the first stage, the bank might have perceived the builder's financial straits and ceased making loans to the builder notwithstanding the continuing guaranty of plaintiff.
As a professional appraiser and inspector, defendant knew or should have known that each of his reports would be relied on to the detriment of a lender if the report was erroneous. Under such circumstances, defendant's duty was not owed solely to the builder, but extended to plaintiff and others that might suffer reasonably foreseeable and direct injury because of a breach of the duty owed by defendant. Privity of contract is not necessary in an action for damages under these circumstances. See Emond v. Tyler Building and Const. Co., Inc., 438 So.2d 681 (La. App. 2d Cir.1983); Am. Fid. Fire Ins. v. Pavia-Byrne Engineering, 393 So.2d 830 (La.App. 2d Cir.1981). Compare State ex rel. Guste v. Simoni, Heck and Associates, 297 So.2d 918 (La.App. 1st Cir.1974). Plaintiff was eventually called on to pay the loans he had guaranteed. In any event, plaintiff is the assignee of the bank's rights and causes of action against defendant. McKneely v. Don Coleman Const. Co., Inc., 441 So.2d 497 (La.App. 2d Cir.1983).
Defendant argues finally that he should only be liable for what it would cost to bring the construction up to the stage of first inspection. The argument seems plausible but was rejected below on the findings that "hardly anything could be salvaged" when plaintiff was required to pay off the loans and that the builder who eventually acquired the lots and constructed residences was required, "for all practical purposes," to "start all over again." This case was tried four years after it was instituted and this finding is supported by the record. The trial court has much discretion in assessing damages. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Plaintiff was required to pay the bank a total of $13,240. The trial court used this figure as a basis for assessing the damages. We find no error in this approach.
For the reasons assigned by the trial court, which we adopt and here summarize, the judgment is AFFIRMED.