FEDERAL SAVINGS & LOAN INSURANCE CORPORATION, as Receiver for Northlake Federal Savings & Loan Association

v.

Max J. DERBES, Jr., Michael W. Truax and Max Derbes, Inc.

Civ. A. No. 86–2764.

United States District Court, E.D. Louisiana.

Jan. 12, 1990.

Ryan & Willeford, James F. Willeford, Trial Atty., John H. Ryan and Noel E. Vargas, II and Montgomery, Barnett, Brown, Read, Hammond & Mintz, Harold B. Carter, Jr., Trial Atty., John Y. Pearce and Leila D'Aquin Erato, New Orleans, La., for Northlake Federal Sav. & Loan Ass'n.

Bienvenu, Foster, Ryan & O'Bannon, Ernest L. O'Bannon, Trial Atty., and J. Keith Hardie, New Orleans, La., for Max J. Derbes, Max J. Derbes, Inc., Michael Truax and National Cas. Co.

Steven K. Faulkner, Jr., Metairie, La., for C. Nolte DeRussy, Jr.

Federal Home Loan Bank Bd., Harry Quillian, Ralph W. Christy, William K. Black, Paul W. Grace and Loretta Reid Pitt, Trial Atty., Washington, D.C.

McGlinchey, Stafford, Mintz, Cellini & Lang, Dermot S. McGlinchey, Trial Atty., B. Franklin Martin, Henri Wolbrette, III and Kathleen A. Manning, New Orleans, La., for Max J. Derbes, Jr., Max J. Derbes, Inc. and Michael Truax.

Nancy A. Nungesser, Asst. U.S. Atty., New Orleans, La., for Federal Home Loan Bank Bd.

Nikki Calvano, U.S. Dept. of Justice, Civil Div., Torts Branch, Washington, D.C.

Robert L. Sumrall, Mandeville, La., pro se.

## MEMORANDUM OPINION

ARCENEAUX, District Judge.

Northlake Federal Savings & Loan Association ("Northlake") filed this suit on April 28, 1986 in the 24th Judicial District Court for the Parish of Jefferson against real estate appraiser Max Derbes, Jr. ("Derbes") his appraisal firm, Max Derbes, Inc. and an employee, appraiser Michael Truax ("Truax"), to recover the balance of a loan made to build a parking garage/retail development in New Orleans, Louisiana's Warehouse District. Plaintiff alleged that defendants' appraisal of the proposed development was negligently prepared in violation of La.Civ.Code Ann. art. 2315 (West 1986) and so caused Northlake to lose $9,683,830.15 when the borrowers defaulted.

After the Federal Home Loan Bank Board ("FHLBB") appointed the Federal Savings & Loan Association ("FSLIC") Northlake's receiver on June 19, 1986, FSLIC removed the suit to this Court. This case was tried to the Court without a

jury and was taken under submission. After thoroughly reviewing the evidence, record, memoranda supplied by counsel and applicable law, the Court issues its opinion.

## FACTS

Most of the relevant facts are uncontroverted.

In February 1983, members of what later became the South Peters Street Partnership ("partnership") began negotiations to purchase a parcel of land in the Warehouse District of New Orleans, Louisiana located on Fulton Street immediately across the street from the New Orleans Convention Center and adjacent to the site of the Louisiana World Exposition ("World's Fair" or "Fair") to be held during a six-month period in 1984.[1] Sal Piazza, vice-president of a wholesale seafood distribution business in New Orleans and one of the leaders of the development, engaged the architectural firm of Burgdahl and Graves to design a parking garage on the site since Piazza knew that Fair officials believed there was a shortage of available parking for the Fair area.

During the next several months Burgdahl & Graves prepared several sets of drawings reflecting various development ideas formulated by the partnership. Specifically, Piazza proposed a phased development: in addition to a multi-story parking garage, the first phase of the Fulton Street project was originally proposed to house retail businesses in its first floor and a restaurant on its roof. The foundation would be fortified to accommodate condominium or office towers to be added in the subsequent development of phases II and III.

On April 28, 1983, having been forwarded a set of sketches incorporating the parking, retail, restaurant and fortified foundation features, Truax rendered a preliminary analysis approximating the project's value at $13,000,000.00 to $13,500,000.00. Max Derbes, Inc. was paid $3,500.00 for this preliminary analysis.

After receiving the preliminary analysis, Piazza asked Truax to perform a formal appraisal. This appraisal, ("appraisal"), addressed to Piazza and signed by both Truax and Derbes, was dated May 27, 1983 and valued the project at $12,250,000.00 (P-7). The cover letter and its analysis reflect that the appraisal was made with the assumption that the project would be completed by the opening of the World's Fair in April, 1984 "substantially in accordance with the plans and specifications submitted." (P-212). These plans specifically called for an 822 car garage, 20,262 square feet of finished retail space on the ground floor and an 11,000 square foot rooftop restaurant.

Because the Fulton Street project site was zoned for less intense use than the partnership was planning, a zoning variance was necessary before construction could begin. This required that the project's design win the approval of the New Orleans Historic District Landmarks Commission because the site was located within an historic district. In April of 1983, the architects began working towards obtaining a variance. These negotiations led to changes in the project's design from those represented in the April drawings. The first floor retail mall was rotated ninety degrees, the parking garage ramps were shifted and a new material was required for the building's facade. At some indefinite time before construction began, the restaurant was moved to Phase II, the Phase III proposal was eliminated and the amount of foundation strengthening was reduced. These changes were not communicated to the defendants and they did not

1. The partnership, a Louisiana partnership *in commendam,* was formally organized May 31, 1982 (P-8). It was the brainchild of Sal Piazza and Ray Baas, president of the Mississippi River Bank. Piazza and Baas, who each held a 19% interest in the partnership, recruited eight other general partners: Salvadore Piazza, Sal's father; Robert "Bobby" Sutherlin, brother to Northlake's president, John "Buzzy" Sutherlin, who each also held 19% interests in the partnership; Mark Delesdernier, holding a 9% partnership interest; Roy Baas, holding a 7% interest; David Bruce and Gregory Bruce, who each held 2% interests; and John Alvah Leddy and William Curry, who each held 1% interests in the partnership. (New Frontier Corporation, holding a 2% interest in the partnership, was its sole limited partner.)

ask either the architects or Piazza if any design changes were made before rendering the appraisal.

While the architects negotiated with these groups for the zoning variance, the partnership arranged for financing the project. The uncontradicted trial testimony of Piazza and Robert Sutherlin was that John Sutherlin was admitted to the partnership for the purpose of arranging financing. A loan application requesting construction financing in the amount of $10,200,000.00 was prepared by Ray Baas and delivered by Robert Sutherlin to Northlake on the morning of June 6, 1983. Piazza testified that he received a telephone call from Baas shortly after noon that day reporting that Robert Sutherlin had obtained a verbal commitment from Northlake that it would fund the loan, that Robert Sutherlin had verbally accepted on the partnership's behalf and that a written commitment letter would be forwarded to Robert Sutherlin the next day. Robert Sutherlin returned to Northlake on June 7, 1983, received a signed copy of the commitment letter (P–31), signed his name accepting the commitment letter on behalf of the partnership that same date and made a copy for Piazza.

This commitment letter contained a number of stipulations, including that Northlake receive a copy of the project's building permit prior to the closing (Id., para. 16). The letter also required that a project funds analysis for disbursing loan proceeds be submitted to Northlake before the commitment would be binding (Id., para. 15). Northlake never received either of these documents. Defendants were not responsible for providing them.

Sandra MacKay, loan officer at Northlake throughout 1983, and John Sutherlin, Jr., Northlake's president and brother of Robert Sutherlin, testified concerning Northlake's usual procedures for processing loan applications. According to them, MacKay would receive the applicant's loan documents and essentially check the application for completeness and verify major components of the package, such as the amount of the requested loan and the types of security proposed. She would then record information concerning the loan, such as the entity requesting the loan, the amount sought and the appraised value of the security, on a submission sheet that would be sent to members of Northlake's board of directors to be used at regularly scheduled loan committee meetings. The directors would determine whether and under what conditions a loan should or should not be approved. The loan committee was composed of any members of the board of directors who attended the scheduled meetings. MacKay usually attended these meetings with all the material submitted in support of each loan on the agenda in case the Directors wanted further information concerning any proposed loan.

MacKay testified that she received the partnership's loan application, which included the appraisal, from Robert Sutherlin on June 6th and that it was lacking financial statements of some members of the partnership and statements of other members were incomplete. She testified that Northlake president John Sutherlin told her on June 6th that the loan for the entire amount requested by the partnership had been approved and that she should draft the June 7th commitment letter. There had been no meeting of Northlake's board of directors concerning the loan and, in fact, the loan was not considered by the Northlake board until June 16, 1983 (D–225). By letter dated June 8, 1983 and addressed to the partnership through Robert Sutherlin (Sutherlin–213), MacKay asked for the missing financial information in order "to complete processing on each Borrower for the [partnership] ... on the [loan to the partnership]." This letter also asked that the cover letter for the appraisal be readdressed to Northlake and for a copy of the purchase agreement for the land. With the exception of the revised cover letter, the evidence reflects that Northlake did not receive any other information concerning this loan or the borrowers.

Despite MacKay's letter indicating that important borrower information was lacking, the board approved the loan to the partnership as committed on June 7 with no

more information than Northlake had as of that date (P–98).

MacKay did not know why John Sutherlin had her issue the commitment letter before the board had considered the loan application; she presumed Sutherlin had personally contacted board members due to the size of the loan. MacKay testified that her review of the appraisal was limited to seeing if the cover letter was made out to Northlake, making sure the appraisal was signed, and checking the cover letters to determine the appraiser's qualifications and the appraised value of the proposed project. It is clear that MacKay did not read the appraisal. In any event, MacKay testified that she did not underwrite the loan, prepare the board submission sheet, attend the June 16th meeting or have any knowledge about any discussion that took place concerning the loan. The loan officer who did prepare these documents, Mary Abella, was not called as a witness to testify at trial.

John Sutherlin testified that he read the Derbes appraisal before "the loan was made" (Sutherlin, Tr. Vol. VIII, p. 115) but could not recall in what depth he reviewed it or what conclusions he may have drawn from it. He also testified that he had no independent recollection of whether or not he reviewed any other material in connection with the loan. John Sutherlin could not recall what material concerning the partnership's loan application was presented to the board at the June 16th loan committee meeting and no one else attending the meeting testified in this case.

The loan closed on August 8, 1983; loan documents show that Northlake provided 100% of the funds needed to finance the project. The partnership was obligated to repay the loan in 24 months. There was no provision or requirement for permanent financing made at this or any other time. There was also no provision enabling Northlake to refuse for any reason to disburse any of the loan amounts. Northlake charged a two point discount to cover origination and disbursement fees of $102,-000.00 each. John Sutherlin was paid $102,000.00 for examining the title, al-

though he admits that he had retained the law firm of Earhart and Farris at the rate of $5,000.00 per month to perform all of Northlake's title examinations, including that for the partnership's loan. At that time, Northlake had not received any of the information requested in its June 8, 1983 letter except for the readdressed letter covering the Derbes appraisal report.

The parties have stipulated that Northlake advanced a total of $9,683,830.15 to the partnership.

The building contract was executed on August 13, 1983. While the initial plans called for the Fulton Street structure to have been completed before the opening of the World's Fair on May 12, 1984, it was not substantially completed until January 1985.

Northlake was chartered as a federal mutual savings and loan association on May 12, 1980 and opened for business July 17, 1980. It suffered a troubled history from its inception. On June 1, 1983, Northlake's repeated record of noncompliance with regulations promulgated by the Federal Home Loan Bank Board, then the supervisory authority for savings and loan associations such as Northlake, led to a supervisory agreement in which Northlake explicitly agreed to abide by certain standards contained in Memorandum R41(b) governing appraisal reports it received in support of loan proposals. On August 11, 1983, Northlake entered into a cease and desist order with the FHLBB requiring that Northlake remedy its failure to comply with a number of FHLBB regulations including violations of the "loans to one borrower" rule. On March 13, 1985, the FHLBB appointed James Hinman as Northlake's conservator. As part of his review of Northlake's operations, Hinman retained R. Dunbar Argote to submit an independent appraisal of the Fulton Street development. Argote submitted the requested appraisal on May 1, 1985, valuing the project at $3,000,000.00.

Another appraisal of the Fulton Street project was submitted to the FSLIC on October 15, 1986 by Roy Schwartz, Jr. valuing it at $2,000,000.00. The Project was

scheduled for public foreclosure sale in March 1987 requiring a minimum bid of approximately $3,333,333.34. There were no bidders. On May 14, 1987, the project was again set for auction with no minimum bid asked and it sold for $1,650,000.00. The proceeds of this sale, net Northlake's costs, were $1,598,868.40.

## DISCUSSION

This action is based on the Louisiana law of negligence, La.Civ.Code Ann. art. 2315 (West 1986) ("Art. 2315"). Specifically, the FSLIC alleges the tort of professional malpractice, claiming that the appraisal was substandard and that defendants thereby violated their duty to Northlake, assumed by holding themselves out as real estate appraisers.

To recover, the FSLIC must prove, by a preponderance of the evidence, all of the following elements: (1) defendants owed a duty consistent with their status as professional appraisers to provide Northlake with an accurate appraisal and that losing funds through a foreclosure sale of the Fulton Street project was within the risk of harm resulting from a breach of this duty; (2) defendants breached the duty; (3) Northlake relied upon the resulting negligently prepared information and (4) Northlake suffered injury as a result. *Alley v. Courtney*, 448 So.2d 858 (La.App. 2d Cir. 1984), *writ denied*, 450 So.2d 360 (La.1984); *Gantt v. Boone, et al.*, 559 F.Supp. 1219 (M.D.La.1983), *aff'd*, 742 F.2d 1451 (5th Cir.1984).

■ This Court has already ruled that the first element of this malpractice action is met. There is no dispute that the individual defendants held themselves out to be professional real estate appraisers; that they were engaged by the partnership to appraise the Fulton Street project on the basis of these representations; that they knew that the appraisal had been submitted to Northlake in support of the loan application for this project and that Northlake might rely on the appraisal in making its decision to fund the loan. The Court has also held that the risk of foreclosure and any loss a lender might incur as a

result is a risk that falls within the duty the appraiser owes to the lender. (Doc. 245); *Alley*, 448 So.2d at 860.

The real questions raised by this case are (1) whether Northlake relied upon the appraisal in deciding whether to fund the Fulton Street project loan; (2) whether defendants breached their duty to Northlake to provide an appraisal prepared with the skill and care of a prudent professional real estate appraiser and (3) if the appraisal was negligently prepared and Northlake did so rely upon it, was this reliance the cause of any loss sustained. The Court finds plaintiff did not meet its burden of proving by a preponderance of the evidence that any of these questions should be answered affirmatively.

### A. *Reliance*

The evidence submitted pertaining to the timing of the loan's commitment and funding and the consideration that the appraisal received clearly reflects that the appraisal received little, if any, consideration before commitment or approval. As noted earlier, MacKay's testimony revealed that she did no more with the appraisal than glance at the cover letter to note the market value figure, the professional designation on the letterhead and the addressee. John Sutherlin, the only other Northlake officer who could have seen the appraisal before the loan was committed in writing on June 7th, testified that he read the appraisal, but had no independent recollection of what conclusions he drew or what place or purpose the appraisal had in his decision to recommend that the Northlake board approve the loan. There is no evidence that any of the other board members ever saw the appraisal at any time. The loan officer working on the loan did not testify at trial.

The evidence, even viewed in the best possible light to the plaintiff, furnishes no support for a finding that Northlake relied on the appraisal before committing itself to make the loan, or before the date it was approved by the Northlake board.

Furthermore, there is no evidence that Northlake officials even verified whether or not the appraisal covered the same

project that the partnership had requested a loan to build. Testimony of Steven Graves, Burgdahl, and Piazza indicates that the Fulton Street project's scope and configuration underwent significant changes between the time defendants were hired to appraise it and the date the loan application was submitted to Northlake. The defendants appraised a structure to contain an 822 car garage with retail space of 20,262 square feet, an 11,000 square foot rooftop restaurant and a foundation and materials to accommodate the later addition of a condominium tower. The borrowers proposed to Northlake, on the other hand, a project consisting of an 840 space garage with 36,000 square feet of retail space, and a 12,000 foot restaurant to be built, if at all, during the second phase of the project. There was no third phase. These differences caused substantial variances from the cost and income projections contained in the appraisal.

Despite the conditions contained in the cover letter and the body of the appraisal itself—that the appraisal was rendered under the assumptions that the project would be completed substantially in accordance with the plans and specifications submitted to the defendants and in time to service the World's Fair—the evidence does not show that any Northlake official attempted to determine whether these conditions were, or could have been, met.

### B. *Duty*

#### 1. Scope of Duty

■ The standard by which appraisers' work should be measured under Louisiana law appears to be in transition. In the Louisiana case most directly on point, the Second Circuit Court of Appeal has held that appraisers owe their clients service commensurate with that provided by prudent professional appraisers in the community. *Alley v. Courtney, supra* at 858. The Louisiana Supreme Court in *Ardoin v. Hartford Accident and Indemnity Co.,* 360 So.2d 1331 (La.1978), held that the so-called locality rule did not apply in measuring the conduct of a nonspecialized physi-

cian against whom plaintiffs had alleged medical malpractice.

While Art. 2315 does not specify a locality test, it clearly does not prohibit the court from considering appropriate circumstances in formulating the extent of an actor's duty. This Court believes a community standard is essential in properly evaluating a real estate appraiser's professional conduct, and adopts the *Alley* rule in this regard.

The service real estate appraisers provide is the exercise of their judgment of the value of property of various kinds, property which differs in a variety of respects. Such judgments are, by their nature, predicated upon economic and cultural trends, attitudes, habits and customs peculiar to the community in which the appraised property is located. While the analytic tools appraisers employ may consist of standardized methodologies, and while the profession's aspiration may be to increase the uniformity of application of such methodologies, the conclusions they produce are inextricably intertwined with, and inherently dependent upon, conditions characterizing the particular places where the property is located, as well as inherent differences in the properties themselves. While an appraiser's work product is colored by the variances of local conditions, a medical specialist, in all essential respects, works upon a more or less "standardized" model—the human body. The former requires consideration of localized influences, the latter forbids them. A medical specialist's diagnosis should not differ between New Orleans and New York, while the function of an appraiser of real estate, dependent as it is upon willing buyers and willing sellers for determining value, is by its very nature, colored by varying local conditions.

The Court believes the duty of an appraiser is more closely analogous to that owed by a lawyer to his client. As the court in *Gantt v. Boone, Wellford, Clark & Langschmidt,* 559 F.Supp. 1219 (M.D.La. 1983), 742 F.2d 1451 (5th Cir.1984) observed:

[A]s a general rule, an attorney must be accorded considerable latitude in the ex-

ercise of his professional judgment and evaluation of legal issues which are not specifically resolved by legislation or jurisprudence. In such instances, an attorney may not be held liable for malpractice so long as his determination of such a question, whether ultimately held right or wrong, is based upon reasonable consideration of applicable legal principles. *Id.*

For this reason, this Court holds that the defendants' conduct will be measured against the degree of care and skill used by real estate appraisers in the Greater New Orleans area.

■ The amount and degree of skill that must be demonstrated to avoid malpractice liability is the baseline of minimal professional competence. *Id.,* at 1229; *Ramp v. St. Paul Fire & Marine Insurance Co.,* 263 La. 774, 269 So.2d 239 (1972); *Bowman v. Coursey,* 433 So.2d 251 (La.App. 1st Cir.1983), *writ denied,* 440 So.2d 151 (La. 1983); *Weill Construction Company, Inc. v. Thibodeaux,* 491 So.2d 166 (La.App. 3d Cir.1986). Malpractice liability will not be assessed because of errors of judgment aside from unskillfulness or negligence.

■ This professional duty does not include clairvoyance. An appraiser's duty concerning judgments involving potential and necessarily uncertain, future events, like those of an attorney, is to make reasonable assessments that are based on consideration of available facts using accepted professional principles. *See, Muse v. St. Paul Fire & Insurance Co.,* 328 So.2d 698 (La.App. 1st Cir.1976).

### 2. Breach of Duty

#### (a) *Witnesses and Other Evidence*

In support of its contention that the defendants had breached their professional duties to Northlake, the plaintiff submitted the testimony of Richard Hewitt III and R. Dunbar Argote and cited the Court to standards of the American Institute of Real Estate Appraisers ("Institute") as articulated in its textbook, *The Appraisal of Real Estate* (8th Ed.1983) ("appraisal text"), its *Code of Professional Ethics— Standards of Professional Practice* (1982 Rev.) ("code") and an article written by defendant Max Derbes, "Highest and Best Use—What Is It?", *Appraisal Journal,* pp. 166–78, April, 1989. Mr. Hewitt, the Chief District Appraiser and Loan Underwriting Specialist for the FHLBB, Southeastern District at the time the Appraisal was made, was qualified as an expert on appraisal analysis. R. Dunbar Argote, a New Orleans real estate appraiser, was also qualified as an expert appraiser testifying concerning his critique of the appraisal.

Testimony in this case concerning appraisal construction and analysis by Truax, Derbes, Argote, Hewitt and Terry Oetzel [2] clearly indicates the highly experiential nature of the appraisal process. It is beyond controversion that accurate and effective appraisals cannot be conducted without firsthand knowledge of the site appraised and its relationship to the local real estate market, the local economy and comparable sites. The testimony and evidence also demonstrated that appraisers, as are any involved in a service industry, must be sensitive to the needs of their clients. These considerations demand flexibility and judgment to which textbooks are seldom helpful; textbooks most often recommend principles for paradigmatic situations and teach rules that govern the general or common problems encountered in an applicable field. Rarely are they written to account for peculiarities of events or circumstances.

The Institute's appraisal text and code are no exceptions. The appraisal text's discussion of how an appraiser determines the highest and best use of his subject, for example, establishes a four part analysis to be considered in sequence. Plaintiff argues that this analysis should be mechanically applied in this case and that so

---

**2.** Oetzel is a former president of the Institute and was qualified as an expert in real estate appraisal reviews. That expertise is essentially without evidentiary foundation here since there

is no evidence that any Northlake official ever "reviewed" the appraisal for loan evaluation, or other relevant purposes.

viewed, the appraisal is substandard since, contrary to the appraisal's representation, the zoning designation appropriate for the structure appraised had not been achieved at the time the appraisal was written. The evidence indicates, however, that development trends in the Warehouse District surrounding the Fulton Street project towards high density, intense commercialization (i.e., office, motel/hotel and retail use), and the necessary zoning variances and changes that had been realized to allow this development to occur, made it reasonable for the defendants to believe that the necessary zoning changes would be easily made and that the project could go forward as appraised. The appraisal contained this characterization of such information (P–7, p. 31) and examples to support it. Given these facts, it was well within acceptable professional judgment for defendants to recommend this use for the property, even though formal adherence to strictly textbook principles might weigh otherwise. With the development information at hand, and in light of the area's rapid movement to accommodate the Fair, it was reasonable at that time for the defendants to conclude that there would be no real impediments to achieving approval for the type of structure it determined to be within the highest and best use of the property.

Similarly, plaintiff has construed the appraisal text's discussion of highest and best use to require soil borings to determine the physical feasibility of the structure proposed before recommending it. It also would have had the defendants perform or commission a variety of other empirical studies concerning each and every type of structure that could have been built on the site to determine if a parking garage/retail space/restaurant structure was, in fact, its highest and best use. Because the defendants did not conduct such studies, plaintiff asserts, the appraisal did not conform to professional textbook standards and so defendants must be found liable.

The appraisal text does not expressly require such exhaustive measures but to the extent it can be construed to do so, the testimony of Truax, Derbes and Argote indicates that it is grossly out-of-step with the real-life demands of an appraisal practice. Neither the defendants nor Argote performed such testings or constructed models for determining cost and revenue streams for alternative uses of the site in their appraisals of the project, nor did they say such testings would be necessary. And for good reason. It is uncontroverted that defendants were furnished architect plans that indicated a proper foundation could be built to support such a structure. Derbes' testimony was uncontradicted that the economic modeling for alternative uses for the site would have been overly costly, time consuming and beyond the scope of his assignment. Both Derbes and Truax testified that they did consider other uses. Because the structure proposed was consistent with their finding of intense commercial utilization as the highest and best use of the property, they did not investigate alternative uses of intense commercial utilization. In other words, the Court finds that an appraiser need not analyze in detail every possible use and sub-use, to avoid malpractice liability. It is only when two substantially different uses are possible, or other appropriate but unusual circumstances are present, that such an analysis need be made, and then only with client approval, or upon its instructions. Because such circumstances were not presented here, an elaborate modeling was not necessary and did not detract from the utility or accuracy of the appraisal's highest and best use recommendation.

While the appraisal text, the code and the Derbes article are helpful to the Court in determining general appraisal standards, and their principles have been closely scrutinized, they have not been mechanically applied by the Court in evaluating the specific appraisal circumstances presented.

The Court has likewise carefully considered the testimony and review appraisals of Hewitt and Oetzel. These experts performed "desk reviews," meaning that they reviewed the Derbes appraisal strictly for compliance with formal appraisal standards. Hewitt concluded that the appraisal did not comply with "accepted professional appraisal practice." Hewitt's review, how-

ever, is more properly described as a determination that the Appraisal did not comply with FHLBB Memorandum R41(b) ("R41(b)"), prescribing minimum standards for appraisals submitted to savings and loan associations.

The defendants admitted that they did not draft the appraisal to meet R41(b) standards but to those of the Institute. Hewitt did not testify that the defendants' value opinion was wrong, nor did he provide a value opinion for the project as of March 1983. The Court is hard pressed to see the value of Hewitt's testimony in evaluating the competence of defendant appraisers (See footnote 2, supra). If the point of Mr. Hewitt's report and testimony is that the appraisal did not comply with R41(b), this is admitted by defendants. There is no evidence that indicates, however, that R41(b) is the standard by which the validity of an appraisal should be judged, aside from its embodying appraisal principles such as those contained in the appraisal text. Hewitt did testify, however, that one of the purposes of R41(b) was to provide a reasonable standard by which savings and loan institutions could determine the reliability of an appraisal, and he concluded that Northlake should not have made the loan to the partnership because the appraisal did not meet with R41(b) standards.

Of course, it remains completely puzzling how invocation of R41(b) could taint an appraisal which Northlake's officials never substantively examined or relied upon. In any event, all of these factors, combined with the fact that Hewitt was admittedly unfamiliar with the New Orleans market and therefore made no comment on the values defendants reached, makes his opinion of limited use in determining defendants' liability. The thrust of Hewitt's rationale is directed principally at the negligence of Northlake, its officers and employees—which, in the opinion of this Court, is properly where causative fault should rest.

The Court is also reluctant to give much weight, if any at all, to the testimony of Argote. First, the Argote appraisal was completed in 1985, well after the New Or-

leans economy and perceptions of its direction had taken a radical downward turn from the rosy and optimistic circumstances prevailing in May 1983. This appraisal was also post the bankruptcy of the World's Fair and the realization that the residual developments produced by the Fair, such as the development of the Fulton Street Mall, a Rouse riverfront development extending from Poydras Street to Howard Avenue, the expansion of the Convention Center, and explosive redevelopment of warehouses into residential living units, would be slowly achieved, if ever. The current state of the Warehouse District contrasts with the evidence supplied at trial of the climate of May 1983 during which the prevailing economic wisdom in New Orleans was that the World's Fair would have a positive effect on the local economy and would be a powerful—if not irresistible—spur to the developments mentioned above.

The second reason the Court must view Argote's appraisal and testimony with abundant caution, if not downright skepticism, is that Argote and defendant Derbes are fierce business competitors between whom there is no love lost. A severe dispute took place over fees Derbes allegedly owed Argote. Argote admitted at trial that it was after this dispute arose that he was contacted by a representative of plaintiff and supplied with a copy of the appraisal in order to provide "advice as to any irregularities, negligence, oversights or other detrimental comments regarding the appraisal ..." (D–19). Argote testified that after cataloging his objections to the Appraisal, he recommended that the plaintiffs bring this lawsuit.

The Court is further skeptical of the Argote evidence and testimony since significant and increasing proportions of Argote's livelihood are due to work for FSLIC. Argote testified that he received 34% of his income from FSLIC in 1985; 50% of his income in 1986 from this source and 58% of his income from FSLIC in 1987. All these factors, in conjunction with Argote's demeanor in the Courtroom, cause the Court to give little credence to his testimony. Clear evidence of bias requires

a Court to accord little weight, if any, to such evidence. *See Waffenschmidt v. MacKay,* 763 F.2d 711, 724–25 (5th Cir.), *reh denied,* 770 F.2d 1081 (5th Cir.1985), *cert. denied sub nom; Waffenschmidt v. First National Bank of Mount Vernon, Texas,* 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986).

### (b) *Appraisal*

Bearing in mind the foregoing, the Court turns to the specifics of plaintiff's contentions that defendants breached their duty of care to Northlake in preparing the appraisal.

The plaintiff essentially alleges that the evidence and testimony show that defendants were negligent in (1) selecting and collecting the data used in the appraisal; (2) analyzing the highest and best use of the property on which the project was built; (3) applying appraisal methodology to the data collected; (4) arriving at a final value estimate for the project; and (5) reporting their value estimate. They therefore conclude that the appraisal was inaccurate and misleading and the defendants should be held liable for Northlake's loss on the loan.

The evidence clearly shows that the appraisal was not perfect. Defendants admit, as indeed they must, that the appraisal misstates the property's zoning designation, and that such designation—if not changed—would affect the appraisal's highest and best use determination. Further, as the defendant's own review appraiser, Terry Oetzel, found, more information could have been provided in the appraisal to buttress the defendants' projections of parking demand (a part of both the income and cost components of their value conclusion), and the actual purchase price of the Fulton Street property, also a factor in determining value.

The Court is of the view that any work, such as an appraisal, based on judgments

concerning a myriad of components and factors can be subjected to a jeweler's inspection and fall short of perfection. Perfection is not the standard, however, by which the defendants' work is measured in such a case. A clear preponderance of the evidence demonstrates that any deficiencies were relatively minor when viewed against the backdrop of radical economic events and changed perceptions in New Orleans occurring after the time the appraisal was written. In addition, the majority of the information contained in the appraisal was based on judgments that were reasonable when made.

For example, while the appraisal's statement that the site was zoned at that time for the parking garage/retail/restaurant use then proposed was in error, any impact this error might have had was tempered by the representations discussed earlier concerning development trends in the neighborhood to the effect that required zoning changes could have been secured in time for the project to proceed as then scheduled. A summary of the zoning progress reports sent from the architects to Piazza indicates that the partnership and the architects in charge of securing the necessary zoning changes were optimistic that a zoning adjustment would be achieved in time to meet the planned schedule. Piazza and Truax testified that Piazza had told Truax that the partnership would obtain the required building permit.[3]

As a result, the accurate representation on this score would have been that while current zoning did not allow for the use the partnership proposed for the site, the appropriate zoning classification was likely to be achieved in time for the project to be completed for the opening of the World's Fair. The appraisal text indicates that it is appropriate to proceed with an evaluation of highest and best use based on such a

---

**3.** The defendants' reliance upon the developer's representation on this score, contrary to plaintiff's argument otherwise, is appropriate. Oetzel testified that an appraiser is justified in relying on this type of representation if his knowledge of the customs and practices of the local community leads him to believe that such representations are credible. Plaintiffs have produced no evidence that such a reliance was not justified other than to assert that Piazza's inexperience with property development damaged his reliability. Piazza was intimately involved, however, with the architects, who were spearheading this effort. On the basis of this evidence, this reliance was reasonable.

condition, and the Court finds that the manner in which the representation was phrased made no material difference, if any difference at all, on the analytic value of the appraisal.

The defendants' analysis of parking might have included a more detailed consideration of the decision to include parking demand generated by the New Orleans Convention Center (steps away from the Fulton Street site) the Rouse development planned for the Riverfront area, Warehouse District housing renovation, the Fulton Street mall, commuters from the Poydras Street business corridor and the proposed Hershey project, even though the primary parking analysis study it relied upon (the Cambridge Systematics Parking Study ("Cambridge study")), did not include such factors in assessing parking demand for the Warehouse District. The defendants also might have been well-served in seeking their client's authority to engage an expert in parking demand to conduct a survey to assess the local market. The appraisal's parking analysis does, however, contain explanations supporting its methodology and justifying the inclusion of these factors in the report.

The Cambridge study did not include the Convention Center because of the Center's unique nature. The propriety of the defendants considering parking demand generated by this facility, located immediately across the street from the structure, is not challenged by any evidence introduced at trial. The Cambridge study did find that the Rouse project would generate demand for 500 parking spaces. Plaintiff argues, nevertheless, that the Cambridge study indicates that New Orleanians are unlikely to park more than 1200 feet away from the facility to which they are going and so the Rouse project should not have been included in the Fulton Street demand projections. The testimony of Greg Faulkner, the author of the Cambridge study, makes clear, however, that the "1200 foot rule" was not determined until after the publication of the study. Defendants did not have this information available at the time the appraisal was made. In addition, it is questionable whether such a factor is necessary since the market study of the Fulton Street site commissioned by Argote ("Meistchovich Study") found that the Rouse development would generate 35–40% of the Fulton Street garage's parking demand, without analysis of any formal distance limitations.

The defendants were also justified in including demand generated by the expected development of the Fulton Street mall, residential development, the Hershey project and commuters from Poydras Street. Use of these factors were all predicated, testified Truax and Derbes, on their experience over the previous years of the ever increasing development of the Central Business and Warehouse Districts. The evidence makes this conclusion a reasonable one to have reached under the circumstances then prevailing. The appraisal listed forty-one renovation projects either completed, proposed or planned for the Central Business District at that time, eleven of which were located in the Warehouse District. That the defendants could conclude at a pre World's Fair time that development prospects for the Warehouse District, and most particularly, in the immediate World's Fair vicinity, were vigorously growing is not unreasonable in assessing potential parking demand.

While the appraisal's value estimate might have explicitly taken into account the actual purchase price of the Fulton Street site, the defendants admit they knew this figure but did not include it in the appraisal because the sale had not then been perfected. Including such information would have had virtually no effect on the value definition. The actual price paid by the partnership for the land was $1,850,000.00; Northlake loaned $100,000.00 to demolish the building then standing on it, yielding an actual land cost of $1,950,000.00, only $50,000.00 less than the appraisal's estimate of site value. Northlake knew what the partnership paid for the site and it knew the amount requested by the partnership for demolition costs. Plaintiff cannot, under these circumstances, shed tears about not being furnished information that Northlake already had. In any event, the estimate

makes no material difference in the value the defendants reached in the appraisal.

While the plaintiff has attacked the market data collected by the defendants—the comparable properties and structures with which to estimate the costs and income and so the potential value of the Fulton Street project—the evidence shows they were selected with skill and care.

Because of the unique use of this property, strict comparable developments were difficult to identify and the defendants noted this fundamental problem in the appraisal. They then analyzed eighteen land comparables, only two of which were located in the Warehouse District, the rest being found in the Central Business District. They then rejected reliance on the two Warehouse District properties as too dissimilar for comparison with the Fulton Street property, and relied only upon the sale prices of Central Business District property, applying a discount to these values for the time estimated for the Fulton Street property to develop. The appraisal plainly identified this process and provided reasons why the two more proximate properties were rejected and the more valuable properties chosen. The appraisal also clearly noted that the decisions as to which properties chosen, and the amount that their sales figures were discounted, were the result of the appraisers' considered judgment concerning development trends that were highly influenced by the impending World's Fair and the physical development that the Fair was expected to spawn:

> Many of the sales are located nearer the heart of the CBD in more prominent settings, and they clearly establish an upper limit of value for the subject. In comparing these sales to subject, however, the impact of the World's Fair and development expected to be realized after same somewhat temper the locational adjustment that might otherwise be indicated. The level of the adjustment is,

nevertheless, highly subjective (P–7, p. 53).

Argote criticized the use of these comparables because they were located so far from the Fulton Street garage and their use was predicated upon a determination that the Warehouse District values would approach those of Central Business District properties within three years. The appraisers' estimate was based, however, on values of properties of comparable size in an area of New Orleans with values that the defendants reasonably believed, given the World's Fair and development activity taking place in the Warehouse District as a result of the Fair, better reflected the future of the property. The appraisal clearly contained the evidence of the Warehouse District development noted earlier and clearly identified the bases for these conclusions. In addition, beyond the general comments regarding Argote's credibility noted earlier, his opinions on this point are impeached by his use of estimates of potential value based on assessments of future growth rates in his own appraisal of the Fulton Street property.

This Court finds that the defendants reasonably rejected comparable sales in the Warehouse District and determined that property located in the Central Business District provided a better index of value. At the time the appraisal was written, the defendants' market data approach to estimating the project's value was prepared well within the scope of professional competence required.

The defendants' estimate of the cost of improvements as a component of determining the project's value was also properly prepared. The defendants based their cost estimates on the rough sketches of the project they received from the architects at the time Truax prepared the preliminary appraisal calling for a garage, retail space on the first floor, a rooftop restaurant and an added increment for improving the foundation to support subsequent additions to the project.[4] The defendants represented

---

**4.** Plaintiff argues that defendants were negligent in not contacting the architects to obtain more specific plans before completing the appraisal. If they had, plaintiff contends, the defendants

would have discovered the changes to the garage's structure, that the restaurant had been delayed to Phase II of the development and that the Phase III improvements had been dropped

in the appraisal that the cost figures developed for the restaurant and the retail space were checked against the Marshall Swift Valuation Service, a national monthly cost service, and against the cost estimates supplied by the developer. Argote testified that the cost estimates for these structures were too high because they were sufficient to build freestanding facilities and that they exceeded the Marshall Swift Valuation Service figures.

The defendants' figures on this score are reasonable. It is appropriate that the facilities were priced as freestanding facilities because, for analytic purposes of the appraisal, they were stand alone facilities: costs for the parking garage were determined on a per space basis, excluding any other facilities. In addition, the plaintiff provided no evidence that the applicable Marshall Swift figures were lower than those used by the defendants. The Court has found no evidence to refute a conclusion that defendants' calculations of costs were the product of sound appraisal practices.

The evidence also indicates that the income side of the determination of the project's value was handled with appropriate professional care by the defendants. Repeating many of the criticisms made relative to the cost side of the value equation, the plaintiff alleges that parking rental income was skewed since the price was determined by reference to inappropriate comparables and because there was no credible evidence to support the defendants' finding that the garage would have adequate stabilized occupancy to support the project.

Plaintiff criticizes the restaurant income analysis because it was based upon restaurant comparables in the French Quarter

---

completely, reducing the cost of the additional foundation below the 25% of cost originally projected. In addition, plaintiff contends, the defendants would have learned that the architects' fee was $200,000.00, not the $300,000.00 figure contained in the appraisal.

The evidence submitted at trial does not support these contentions. Truax testified at trial that he contacted Burgdahl who told him that the cost of the additional foundation would be approximately 25% of the cost of Phase I of the project's development. This testimony went unrebutted since Burgdahl testified that he had discussed an increment with Piazza but did not remember the figure and could not recall whether he had discussed this issue with either Truax or Derbes. Because the appraisal clearly identifies this information as having come from the architect, this writing, contemporaneous with the communication, is more reliable than inconclusive testimony given six years after the fact.

In addition, it does not appear credible that this increment or any other parts of the changed plans could have been reflected in the appraisal since the plaintiff did not prove at trial that more detailed plans were available by the time the appraisal was submitted. Burgdahl testified that a written estimate given to him by one of the project's contractors dated June 3, 1983 says that the contractor had schematic drawings that did not contain much information. The plans that Graves testified were reprinted approximately one week before the appraisal was issued, contain no more detail than the plans on which the appraisal was based.

As for moving the restaurant to Phase II, the only evidence introduced at trial to determine when the change was made indicates that it was so moved, at the earliest, by May 20, 1983, seven days before the defendants submitted the appraisal to the partnership. The change was contained on the fifth page of a series of drawings. (P–228H, 300H, 300J) The cover page of this series shows the restaurant in its original location with no indication that it has been moved to Phase II. In addition, Piazza testified that the restaurant had not been delayed before the Appraisal was issued. Similarly, Phase III appears in all the drawings printed May 20, 1983. Plaintiff has not proved that the project had changed before the appraisal was completed.

Even if the changes involving the delay of the restaurant and the deletion of Phase III had been settled upon before May 27, 1983, the defendants were under no duty to affirmatively discover the changes and have the appraisal reflect them. Oetzel provided unrebutted testimony that an appraiser should complete the appraisal of the assignment given him until the client tells him that the physical description of the assignment has changed. His only duty on this score is to clearly identify the subject appraised.

Lastly, plaintiff's contention that the architect's fee for Phase I was always intended to be $200,000.00 is flatly contradicted by the developer's written agreement, executed May 11, 1983, providing that the architects would be paid $300,000.00 in connection with a "Parking Garage & Condo Structure With Retail Space at Grade Level and Restaurant Atop Parking Structure" (P–5). Truax testified that the developers provided him with this figure. For the foregoing reasons, the defendants acted reasonably and professionally with regard to the facts herein discussed.

and other highly successful and well-established areas that, according to the plaintiff, share none of the risk or uncertainty of an emerging area like the Warehouse District. The defendants' task on this score was made difficult because the defendants had no idea what type of restaurant was envisioned. Again, plaintiff contends, the defendants could have avoided this problem by consulting the architect before rendering the appraisal. The plaintiff also argues that the retail space income figure is unreliable since the defendants presented their conclusions without objective supporting data—that the qualitative report the defendants rendered lacked market comparables.

As with the use of comparables on the cost side of value, the judgment calls permeating this aspect of the appraisal, particularly with regard to comparables, are colored by defendants' evaluation of the anticipated growth of the Warehouse District under the immediate stimulus of the Fair. As discussed earlier, the opening of the World's Fair was generally thought to be a trigger for extensive development along Fulton Street; the Rouse project was to extend along the Mississippi River from Poydras Street to Howard Avenue adjacent to the Convention Center. This and other development activity was, according to prevailing wisdom, to spur residential development within the neighborhood. The defendants, as did the writers of the Harvard (P–180) and PRC studies (P–180A)[5], studies available at the time the appraisal was drafted, believed that after the Fair, the buildings built for that event, the Convention Center and Rouse project, would stimulate retail and restaurant tenants willing to pay premium rents to fill Front and Fulton Streets near the garage.

Against this background, selection of comparables in Central Business District areas, where demand and density were far higher than in the Warehouse District at the time, was a reasonable way to reflect the expected explosive enhancement of value. As discussed earlier, evidence of development prospects for the Warehouse District submitted at trial, cited in the appraisal, and relied upon by the defendants in making the appraisal, supported this conclusion at that time. From the vantage point of hindsight—after the World's Fair concluded in bankruptcy, slowing the development in the Warehouse District, and after the spectacular collapse of the oil-based local economy—many of these trends relied upon by the defendants in developing the appraisal were not realized. But the absence of their actual realization does not make their reasonable anticipation at the time a basis for imposing liability upon the defendants at this late date.

The overwhelming weight of the evidence adduced at trial indicates that the appraisal was soundly prepared and based on prudent judgment exercised on the basis of information and reasonable evaluation of circumstances prevailing at the time.

### 3. Causation

In order to prevail in a case of this kind, a plaintiff must prove that an allegedly negligently-prepared and furnished appraisal was a cause in fact of the loss it suffered. *Gantt*, 559 F.Supp. at 1229–30. The Court has heretofore found that the appraisal furnished by defendants was not negligently done—that defendants' breached no duty owed Northlake. In addition, the facts do not show that, even had there been such a breach, the appraisal caused any harm to Northlake.

As detailed earlier, the evidence overwhelmingly demonstrates that the appraisal was hardly read and never meaningfully considered by any Northlake official connected with committing, closing and funding this loan. In addition, plaintiff's own expert appraisal reviewer, Hewitt, testified that Northlake should not have accepted the appraisal because it failed to comply with Memorandum R41(b).

MacKay testified that Northlake required complete tax returns and financial

---

**5.** The Harvard study is a report entitled "New Orleans Historic Warehouse District: An Analysis of Revitalization" prepared by the Harvard Business School for the Preservation Resource Center of New Orleans. The PRC study is a technical report published by the Preservation Resource Center entitled "New Orleans Historic Warehouse District Study."

statements of all its borrowers before it would consider funding a loan and that the analysis of these documents was an essential part of its loan underwriting procedures in order to ensure the borrower's ability to repay. In this case, the loan application clearly lacked critical and significant amounts of financial information from the borrowers. The partnership loan was committed before the loan committee considered it and it was closed and funded despite the fact that none of the unprovided financial records was ever provided to Northlake. Further, no evidence was introduced at trial to show that even the sparse financials furnished were verified or even attempted to be verified. Further, Northlake closed and funded the loan even though such conduct violated the commitment letter's requirement that the borrowers supply appropriate building permits as a condition of closing. In addition, the size of the loan violated Northlake's legal lending limit by eight to ten times.

In sum, any deficiency in the appraisal was not a cause in fact of the subsequently-realized loss. Among the laundry list of causative events producing the loan was Northlake's violation of its own rules, as well as the FHLBB regulations applicable to this transaction (including Northlake's making a loan clearly violative of the loan-to-one-borrower rule) and its studied and intentional ignoring of even the semblance of sound financial and lending criteria by lending money to a partnership without adequate underwriting, and by advancing funds against the loan without proper compliance with the terms of Northlake's letter of commitment—even as deficient as that letter was.

Defendants' Motion for Involuntary Dismissal pursuant to Federal Rule of Civil Procedure 41(b) is DENIED.

Judgment shall be entered dismissing plaintiff's claims against all defendants, in accordance with the foregoing.