1488, INC. and/or Drago Daic, Plaintiffs–Counter Defendants–Appellees–Cross–Appellants,

v.

PHILSEC INVESTMENT CORP., Ayala International Finance, Ltd., and Athona Holdings, N.V., Defendants–Counter Plaintiffs–Appellants–Cross–Appellees,

v.

Edgardo V. GUEVARA, et al., Counter Defendants–Appellees–Cross–Appellants,

Ventura O. Ducat, Counter Defendant–Appellee–Cross–Appellant,

and

William H. Craig, Counter Defendant–Appellee–Cross–Appellant.

No. 90–2370.

United States Court of Appeals, Fifth Circuit.

Sept. 3, 1991.

Bruce H. Jackson, Baker & McKenzie, San Francisco, Cal., Michael M. Wilson, Miller, Keeton, Bristow & Brown, Houston, Tex., for Philsec, Ayala & Athona.

John W. Berkel, Houston, Tex., for 1488 and/or Drago.

David A. Wills, Houston, Tex., for Ducat.

Before THORNBERRY, JOLLY and WIENER, Circuit Judges.

THORNBERRY, Circuit Judge:

The plaintiff, 1488, Inc., is a Houston based corporation, which participated in an exchange of assets with the defendants, Philsec Investment Corporation, Ayala International Finance, Ltd. and Athona Holding, N.V. in early 1983. The transaction called for 1488 to give the defendants a portion of land in exchange for a portfolio of stocks and a promissory note for approximately $300,000. The agreement also called for the defendants to cancel a debt owed to them by one of 1488's partners. After the exchange had taken place, the defendants were unable to sell the land. They defaulted on the promissory note and then refused to release the remainder of the stock portfolio to the plaintiff as their agreement required. The plaintiff sued the defendants for breach of contract and fraud. The defendants filed counterclaims against the plaintiff and counter-defendants alleging fraud, conspiracy, negligent misrepresentation, and gross and general negligence. After the district court directed a verdict against the defendants on all but two of their counterclaims and affirmative defenses, the jury returned a verdict in favor of the plaintiff. The defendants appeal the jury verdict as well as the district court's directed verdict against them. The plaintiff cross appeals a post-judgment decision by the district court to amend the amount of attorney's fees.

## FACTS AND PROCEDURAL HISTORY

During the early 1980's, Ventura Ducat, a Philippine investor, had loans outstanding with Philsec Investment Corporation ("Philsec"), a Philippine stock brokerage firm, and Ayala International Finance, Ltd. ("AIFL"), a Hong Kong deposit taking corporation. The amount owed to these two entities totaled approximately $3.1 million. As security for the loans, Ducat had pledged a stock portfolio, which was valued at approximately $1.4 million. At the time, both Philsec and AIFL were wholly owned subsidiaries of Ayala Investment and Development Corporation ("AIDC"). The majority stockholder of AIDC, was Ayala Corporation, one of the largest conglomerates in the Philippines, much of whose business included real estate development in that country. In addition, their subsidiaries conducted real estate operations throughout the Pacific region and along the western coast of the United States.

From 1980 to 1982, Philsec tried to collect the outstanding loans that had been extended to Ducat. Philsec was a member of the Makati Stock Exchange in the Philip-

pines, and the rules of that organization required that a stock broker maintain an amount of security that was equal to at least fifty percent of a client's outstanding debt. The value of the shares held as security for Ducat's loans had fallen below that requirement. As a result of this shortfall, Philsec's trading privileges were in danger of being suspended.

In the fall of 1980, the former head of the legal department of Ayala Corporation, Edgardo Guevara, became president of Philsec. As president, one of Guevara's duties included resolving Ducat's excessive liability. During the course of negotiations, Ducat proposed to settle his debt by an exchange of assets, or a *dacion en pago* as it is referred to in the Philippines. Ducat's suggestion called for Philsec to accept title to real estate in lieu of cash in order to clear Ducat's obligation. After extinguishing the debt, Philsec would then return the $1.4 million stock portfolio being held as security. At the time of the proposal, Ducat owned several portions of real estate in Houston, Texas in partnership with 1488, Inc. and its president Drago Daic. Guevara reported this offer to the Chief Executive Officer of Ayala Corporation, Enrique Zobel, who instructed Guevara to pursue the offer. Zobel also advised Guevara to ask Thomas Gomez to evaluate the property offered by Ducat; Gomez was an AIFL employee who often traveled to the United States.

In December of 1982, Gomez looked at several pieces of real estate that were being offered by Ducat and 1488. In a telex to Guevara, Gomez reported that "of the three properties offered by Ven Ducat for loan substitution best possibility is 78 acres undeveloped land on Maxey Rd or north east freeway thirteen miles from Houston downtown." *Plaintiff's Exhibit* # 12. Guevara, among others, believed that the land was worth approximately $2.9 million, but no one had requested an independent appraisal. In his telex to Guevara, Gomez also noted that he felt such a swap would be "fair [and] reasonable" and concluded with a recommendation "that we will be better off taking this opportuinity [sic] now than be faced with potentially longdrawn

legal situation while Ducat loans currency denomination further depreciate." *Id.* Gomez's recommendation was forwarded to Zobel, the Chief Executive Officer of Ayala Corporation, and the exchange was approved by AIFL's board of directors at a meeting in late December. The board had not seen or requested an appraisal prior to approving the transaction at this meeting.

As closing neared, Guevara made a list of the securities in the Ducat portfolio and the prices at which they were trading. This list was sent to Daic at 1488, since they would be transferred to 1488 after the deal was struck.

After the board of directors had approved the exchange, but before the deal had been closed, Xavier Loinaz, an AIFL director, asked Guevara to obtain an appraisal of the property. The defendants argued that their decision to make the exchange was subject to acquiring such an appraisal. 1488, on the other hand, argued that the defendants relied on Gomez's recommendation in consummating the transaction and requested the independent appraisal only as an afterthought. At any rate, William Craig, a former owner of the property and a real estate broker, was eventually selected to conduct an appraisal of the property. Craig appraised the land in January 1983 and concluded that the property had a fair market value of $3,365,000.

The transaction ultimately closed in Harris County. The property was transferred to Athona Holdings, N.V., a company wholly owned by AIFL and Philsec and created specifically to facilitate the exchange of assets. By this point, the parties to the loan agreement had negotiated a reduction in Ducat's original debt from $3.1 million to $2.5 million. Because the land was valued at approximately $2.9 million for the purposes of this transaction, Athona agreed to sign a promissory note, payable to 1488, for the difference between the value of the land and the amount of Ducat's debt. At 1488's request, Philsec transferred the securities in the Ducat portfolio into an account at Philsec for 1488's benefit and began to liquidate them as per 1488's instructions.

Soon after the deal was closed, the market for real estate in Houston declined rapidly. Athona could not sell the property as easily as it had anticipated, and without a source of cash it was unable to make its payments under the promissory note. The defendants assumed that the real estate was worth less than they had been led to believe, and they retaliated against 1488 by refusing to release the securities portfolio to 1488's control as required by their agreement.

After a number of unsuccessful efforts to collect on the promissory note and the securities, 1488 filed suit against Philsec, AIFL, and Athona alleging a variety of claims. First, they sued the defendants for misrepresenting to 1488 that an active market existed for two securities included in the portfolio, the Sabena and Richfield shares when, in fact, those shares were to be withdrawn from the active trading list. 1488 alleged that the defendants knew about the imminent removal but that they had not disclosed this information. Second, they sued the defendants for conversion of the stock portfolio. Third, they sued the defendants for fraud, alleging that Athona had never intended to abide by the provisions of the promissory note when they signed it. Finally, the plaintiffs alleged that the defendants had acted in concert as a common enterprise or in the alternative, that Athona was the alter ego of Philsec and AIFL.

The defendants filed counterclaims against 1488 and several third party defendants (Drago Daic, William Craig, Ventura Ducat and Edgardo Guevara) alleging fraud, negligence and conspiracy. The claims made by the defendants rested on the allegation that these individuals knew or should have known that the value of the real estate involved in the exchange was less than the appraisal value assigned to it by Craig.

At trial, the district court directed a verdict against the defendants on their three counterclaims, with the exception of AIFL's negligence claims against Craig, and all the defendants' affirmative defenses except mutual mistake. The district court also directed a verdict against the plaintiff on its claims of common enterprise and fraud against the defendants. The jury delivered a verdict for the plaintiff on the remaining claims, and for Craig on AIFL's claim. The defendants now appeal the directed verdicts issued against them as well as the jury verdict. The plaintiff cross appeals a post judgment order to reduce the amount of attorney's fees and argues that the district court's judgment is supported by the record.

## DISCUSSION

### I. Directed Verdict Against the Defendants' Counterclaims.

#### A. Standard of Review.

In reviewing a directed verdict determination, we use the same standard as that used by the district court in making the original determination. *See Hinshaw v. Doffer*, 785 F.2d 1260, 1263 (5th Cir. 1986).

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question.

*Id.* at 1262–63 (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc)).

## B. The Fraud Counterclaim.

■ To state a cause of action for fraud under Texas law, a plaintiff must allege sufficient facts to show:

(1) that a material representation was made;

(2) that it was false;

(3) that when the speaker made it he knew that it was false or made it recklessly without any knowledge of the truth and as a positive assertion;

(4) that he made it with the intention that it should be acted on by the party;

(5) that the party acted in reliance upon it;

(6) that he thereby suffered injury.

*Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977). We agree with the district court's decision to grant a directed verdict against the defendants. The defendants failed to allege sufficient facts to establish the elements necessary to demonstrate fraud. In particular, the defendants have failed to allege any facts that would tend to show that the plaintiff or any of the third party defendants made a false representation or a representation with reckless disregard as to its truth.

The Houston real estate market was extremely volatile during the late 1970's and the early 1980's. Like a stream of hot air, property values rose rapidly as the heat and fury generated by speculation and construction plans mounted, but, just as rapidly, the climate cooled and the high-flying market came crashing to an all time low. The real estate transaction involved in this case was certainly affected by this environment of capriciousness. Moreover, a number of additional variables may have contributed to the uncertainty of its value. For instance, the land abutted a two-lane asphalt road that had been targeted by the state for conversion into a major multi-lane divided highway. Water and sewage treatment facilities were located near the boundary lines of the property. In addition, Houston's lack of conventional zoning ordinances meant that the value of the property could fluctuate depending upon the use (commercial or residential) for which the property would ultimately be used.

■ The fact that the defendants were unable to sell the property at the price for which it had been appraised does not demonstrate that the plaintiff or the third party defendants knew that the value of the property was less than the appraised value, nor does it establish that the opposing parties were guilty of negligent misrepresentation or negligence.

■ In support of their allegation of fraud, the defendants rely heavily on a loan application completed by 1488 shortly before the subject property was transferred to Athona. *See* Defendant's Exhibit 29. At the time, 1488 still owed approximately $300,000 to Republic of Texas Savings Association on its original loan for the subject property. The debt had matured and 1488 was planning to move the loan to Home Savings Association of Houston, that is, take out a loan from Home Savings to pay off the debt to Republic. 1488 had planned to borrow $350,000 for that purpose. A line item on the Home Savings loan application form asked for the amount of the loan as a percentage of the appraised value of the land. A figure of thirty-nine percent was typed into that space, and the defendants suggest that this proves that the plaintiff knew Craig's appraisal was erroneous. The defendants reason that if the $350,000 loan amount was only thirty-nine percent of the land's appraised value, then the real estate must have been worth approximately $897,436.

Although their analysis is sound, the conclusion reached by the defendants cannot withstand additional scrutiny. At the time that the loan application was completed, 1488 did not request to have a new appraisal done for the property. Instead, 1488 planned to use the numbers that had been generated for a quasi-appraisal done in 1977. The 1977 report purported only to "supplement" an earlier appraisal that had been conducted in 1974, and the supplement described its function as estimating market value "for mortgage loan purposes" only. *See* Defendant's Trial Exhibit 4. The two page supplement was based on such old information that even the Home

Savings Association would not accept it without additional collateral as security for the loan. *See* Record on Appeal, Vol. 17 at 5–29 to 5–30. The loan, however, was never made because the property was transferred to Athona, and the outstanding loan to Republic was paid off as part of that transaction. In addition, the loan application itself was never signed by anyone affiliated with 1488. The district court was correct in dismissing this argument in support of the defendant's fraud allegations.

■ The defendants also allege that the plaintiff and counter defendants knew that Craig's appraisal was fraudulent because the purchaser's statement signed by their own representative, and the seller's statement, signed by the plaintiff, as well as the title insurance policy all recited a purchase price of $643,416.12. Robert Higgs, general counsel for 1488, explained that because of the nature of the transaction, 1488, for tax purposes, wanted the purchase price on the closing statement to reflect only that amount of cash actually exchanged at the closing as well as the promissory note given at the closing. *See* Record on Appeal, Vol. 17 at 5–127. Although the closing documents recite a purchase price well under the actual sales price, nothing indicates that any of the parties actually believed the property to be worth less than the sales amount.

The defendants also assert that it was error for the district court to deny them permission to designate O. Frank McPherson, a Houston appraiser, as an expert witness after the cutoff date established by a pretrial order for such designations. The defendants contend that the error prevented them from presenting facts that would support their fraud allegations. Although the defendants were allowed to present the testimony of another expert witness on the subject of valuation, they argue that McPherson's testimony was critical because he had performed an appraisal of the property for the Texas Highway Department close to the time period during which Craig had made his appraisal. McPherson's appraisal was performed as part of the State's condemnation proceedings that preceded the planned highway expansion next to the subject property.

■ District courts are given broad discretion in determining whether to exclude expert testimony when a party has failed to designate such witnesses in accordance with pretrial orders. *See Geiserman v. MacDonald,* 893 F.2d 787, 790 (5th Cir.1990). We will not disturb the district courts determination unless it is clear that the court has abused its discretion. *See id.* We review the court's discretion by referring to the following factors:

(1) the explanation for the failure to identify the witness;

(2) the importance of the testimony;

(3) potential prejudice in allowing the testimony;

(4) the availability of a continuance to cure such prejudice.

*Id.* at 791.

■ In their briefs, the defendants fail to provide an adequate explanation for their failure to identify their expert witness in accordance with the district court's pretrial order. This law suit was initiated in 1985, and the defendants had until November of 1988 to designate their expert witnesses. The defendants were aware of the condemnation proceedings, and they, therefore, had approximately three years to determine the identity of any appraiser used by the state. The defendants simply failed to make this inquiry.

Enforcement of the district court's pretrial order did not leave the defendants without an expert witness on the issue of valuation, and the available expert had also conducted appraisals for the Texas Highway Department in the area surrounding the subject property. *See* Record on Appeal, Vol. 20 at 8–58 to 8–60. Any rebuttal testimony concerning the necessary and standard practice for conducting appraisals could have been answered by him. Even if this were not the case, we have previously held that "[t]he importance of such proposed testimony cannot singularly override the enforcement of local rules and scheduling orders." *Geiserman,* 893 F.2d at 792.

Although the degree of prejudice suffered by the plaintiff due to the late desig-

nation of an expert would not have been great, a district court still has the discretion to control pretrial discovery and sanction a party's failure to follow a scheduling order. *See id.* at 791. Such action is particularly appropriate here, where the defendants have failed to provide an adequate explanation for their failure to identify their expert within the designated timetable.

A continuance might have cured any prejudice arising from the defendants' late designation, but such a remedy would have entailed additional expense to the plaintiff and further delayed its day in court. "Moreover, a continuance would not deter future dilatory behavior, nor serve to enforce local rules or court imposed scheduling orders." *See id.*

The district court established a reasonable deadline for designating expert witnesses, and we are loath to interfere with the court's enforcement of that order. Adherence to such scheduling orders are critical in maintaining the integrity of judicial proceedings. The district court did not abuse its discretion in refusing the defendants' request to designate expert witnesses out of time.

The defendants failed to produce enough evidence from which fraud could be inferred to justify the submission of the issue to a jury. Conclusional allegations or speculation regarding what the plaintiff knew or did not know concerning the value of the subject property are insufficient to withstand a motion for a directed verdict. The district court committed no error in granting the motion.[1]

### C. The Conspiracy and Negligence Counterclaims.

Since the defendants failed to present the district court with any facts that would tend to show that the plaintiffs committed a fraud against them, their claim of a conspiracy to commit fraud must also fail.

■ The defendants have likewise failed to present any facts that would tend to support their claim of negligent misrepresentation or negligence. The defendants rely on assumptions and unsupportable conclusions of law in establishing their case for negligence: *"Assuming* the Property's true value is less than $800,000, it is reasonable to *assume* that the counter defendants failed to exercise reasonable care or competence...." Brief for Athona at 45–46 (emphasis added). A party may not rely on assumptions of fact to carry their case forward. The defendants have presented no facts to suggest that the plaintiff was negligent in acquiring its appraisal. The plaintiff hired Craig, a real estate broker, to perform the appraisal after the defendants had already given their initial approval for the transaction. Craig had performed real estate appraisals in the past, and Texas law permits real estate brokers to conduct such appraisals, *see* Tex.Rev. Civ.Stat.Ann. art. 6573a, § 2(2)(E) (Vernon Supp.1988) (original version at Tex.Rev.Civ. Stat.Ann. art. 6573a, § 4(1)(e) (Vernon 1969)). These facts do not support a claim of negligence.

For the foregoing reasons, the district court committed no error in granting a directed verdict against the counterclaims advanced by the defendants.

### II. Negligence Claims Against William Craig.

■ The district court allowed AIFL to pursue a third party claim against Craig for negligence, but it refused to allow Athona and Philsec to pursue identical

---

1. The defendants also contend that the district court erred by concluding that a letter addressed to AIFL from a real estate brokerage firm soliciting a listing agreement for the subject property and opining that the property was worth more than three million dollars was an adoptive admission against interest. The court relied on the letter as an alternative justification for granting the directed verdict against the defendants. The court concluded that the letter demonstrated that the defendants were in agreement with the Craig appraisal and that, therefore, no fraud could have been committed. Even if the court had erred, such error would have been harmless. Having failed to develop a viable theory of fraud, the defendants cannot complain of an adoptive admission that might have contradicted that theory.

claims. The court reasoned that Craig owed no duty to Athona and Philsec because his appraisal was addressed only to AIFL. *See* Record on Appeal, Vol. 21 at 9–16 and 9–79. In analogous situations, Texas courts have held that liability for the information contained in surveying reports and accounting reports may be extended to "persons or class of persons whom the maker of the representation intends to benefit or who foreseeably may be expected to act in reliance on it." *Hermann Hosp. v. National Standard Ins. Co.*, 776 S.W.2d 249, 254 (Tex.App.—Houston [1st Dist.] 1989, writ denied); *Blue Bell v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408, 412 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 234 (Tex.App.—Dallas [5th Dist.] 1985, writ ref'd n.r.e.).

Craig was asked by Robert Higgs, general counsel for 1488, to complete an appraisal as part of the transaction that was to take place between 1488 and the defendants. Although Craig was not familiar with the details of the transaction, he agreed to provide an appraisal. Craig knew that the appraisal was to be used by the party or parties with whom 1488 was dealing, and he knew that the individuals involved were Philippine citizens. The fact that he addressed the appraisal only to AIFL did not limit his liability. The only reason he addressed the appraisal to AIFL is because he did not know the names of all the parties participating in the 1488 transaction. *See* Record on Appeal, Vol. 17 at 5–111. Craig's failure to learn the identity of all the parties participating in the 1488 transaction did not make it any less foreseeable that all parties to the transaction would rely on his appraisal of the property. Therefore, the district court erred in determining that Craig's liability was limited only to AIFL.

■■■■ This error, however, was harmless since the court allowed AIFL to proceed with a negligence claim against Craig, and the jury found that Craig was not negligent. Federal courts have repeatedly held that "a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *Aerojet–General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975); *Southwest Airlines Co. v. Texas Int'l Airlines*, 546 F.2d 84, 94–95 (5th Cir.), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977). In this case, both Philsec and Athona shared precisely the same interests as AIFL, and the parties were represented by the same attorneys. Although the district court refused to allow Philsec and Athona to bring their individual negligence claims, both parties had control over the AIFL negligence litigation to the extent that Philsec was a partner of AIFL and Athona was an AIFL subsidiary. The fact that all three shared the same attorneys only reinforces this point. Since Philsec and Athona's interests were adequately represented by AIFL, any re-litigation of the negligence issue would be prohibited by the principle of res judicata.

### III. Opportunity to Impeach.

The defendants next complain that it was error for the district court to sustain several objections to questions they asked of Edgardo Guevara concerning the value of several of Guevara's assets. Guevara, who represented himself throughout the trial, had noted during his opening statement that he was unable to "afford an American lawyer." Record on Appeal, Vol. 13 at 1–32. The defendants hoped to impeach Guevara by inquiring about his assets.

■■■■ The district court did not abuse its discretion in sustaining the objections that were raised when these particular questions were asked. When the court sustained the objections, the defendants failed to explain to the court why it was necessary to obtain a response, and, therefore, they did not preserve any possible error. *See* Record on Appeal, Vol. 14 at 2–57 to 2–59. Even if the defendants had provided an argument for relevance, we doubt whether the court's actions would have been reversible error, considering the minimal weight such testimony would have had

on credibility. The defendants were allowed to ask Guevara about his salary, and Guevara reiterated that it was his subjective belief that he could not afford the services of an "American lawyer." *See* Record on Appeal, Vol. 14 at 2–60. The value of Guevara's assets would have little impact on Guevara's veracity unless the court allowed the parties to argue that a particular standard should be applied to the term "affordable." The district judge was well within his discretion in refusing to allow the defense attorneys to pursue such arguments.[2]

*IV. Exemplary Damages.*

██ Under Texas law, a jury may not award exemplary damages unless it is determined that a plaintiff has also sustained actual damages. *See Mack v. Newton*, 737 F.2d 1343, 1363–64 (5th Cir.1984); *Wright v. Gifford–Hill & Co., Inc.*, 725 S.W.2d 712, 714 (Tex.1987). In the case before us, the jury awarded the plaintiff $275,000 in exemplary damages against the defendants for conversion of the plaintiff's stock portfolio and for fraudulently misrepresenting that the Sabena and Richfield stocks were marketable securities when they, in fact, were about to be removed from active trading. In addition, the jury awarded the plaintiff $42,000 for actual damages, but these damages were limited to the fraud count and not the conversion count.[3] With regard to the conversion count, the plaintiff was granted equitable relief (the defendants were ordered to deliver the shares of stock remaining in the stock portfolio to the plaintiff). As long as the award for actual damages on the fraud count is sustained, the award for exemplary damages may stand. However, if the award for

actual damages was erroneous, then the award for exemplary damages must necessarily be vacated. The defendants argue this latter case.

██ The defendants correctly point out that the plaintiff brought its suit alleging fraudulent misrepresentation *after* the two year statute of limitations had expired. *See* Tex.Civ.Prac. & Rem.Code § 16.003 (statute of limitations for fraud). Robert Higgs, the general counsel for 1488, testified that he had discovered that there was no market for the Sabena and Richfield stocks shortly after the February 9, 1983 closing. *See* Record on Appeal, Vol. 17 at 5–48 to 5–49. This lawsuit, however, was not initiated until November, 1985, well after the limitations period had expired. The misrepresentation issue should never have gone to the jury. Therefore, the jury's finding of actual damages is nullified. Since the jury verdict is left without a specific finding of actual damages, the award of exemplary damages must be vacated.[4]

*V. Rule 11 Sanctions.*

At the end of the trial, the district court ordered the defendants to pay Edgardo Guevara $49,000 for his expenses as a sanction for bringing a frivolous suit against him. The court held that the defendants never had a case against Guevara and that they only brought suit against him in order to harass and intimidate him. The defendants claim that the district court abused its discretion in making such an award because the court failed to give them adequate notice or opportunity to respond to the imposition of sanctions.

---

**2.** Federal Rule of Evidence 403 states that a court may exclude evidence if its probative value is outweighed by the danger of "confusion of the issues, or misleading the jury, or by considerations of undue delay, [or] waste of time."

**3.** For reasons not at all clear, the plaintiffs decided to forgo the $42,000 award for actual damages and asked only that the district court award them the actual Sabena and Richfield stocks that the defendants had withheld. *See* Brief of 1488–A, Inc. in Support of Motion for Judgment, Record on Appeal, Vol. 10 at 81–83.

The district court granted the request and did not award the actual damages as determined by the jury. *See* Final Judgment, Record on Appeal, Vol. 10 at 62.

**4.** Although Texas courts have allowed the award of exemplary damages in cases such as this where the only relief granted is equitable, they have required the plaintiff to prove that it has also suffered actual damages. *See Mack*, 737 F.2d at 1363–64. The plaintiff has failed to demonstrate such loss or injury and none was found by the jury.

 The Rule 11 motion was first made by Guevara on February 14, 1990, and the court immediately ruled on the issue without giving the defendants an opportunity to prepare a written response. *See* Record on Appeal, Vol. 22 at 10–25 to 10–37. Although, the defendants were given an opportunity to speak, we conclude that the hearing failed to comport with the requirements of due process, which demand that the defendants be provided with adequate notice and an opportunity to prepare a response. *See Henderson v. Department of Public Safety and Corrections*, 901 F.2d 1288, 1293–94 (5th Cir. 1990). Providing specific notice and an opportunity to respond is particularly important in cases, such as the one before us, in which the sanctions have been imposed on the clients and not the attorneys. *See Donaldson v. Clark*, 819 F.2d 1551, 1560 (11th Cir.1987) ("If sanctions are proposed to be imposed on the client, due process will demand more specific notice because the client is likely unaware of the existence of Rule 11 and should be given the opportunity to prepare a defense.").[5] A separate hearing is not a prerequisite to the imposition of Rule 11 sanctions, *see Donaldson*, 819 F.2d at 1560 n. 12, but the defendants in this case, should have been given more of an opportunity to respond to the motion than that provided at the hearing in which the motion was first raised. Providing the defendant with an opportunity to mount a defense "on the spot" does not comport with due process. Given that the defendants were not provided with adequate notice or an opportunity to be heard, we vacate the award of sanctions and remand so that the district court can provide the defendants with an adequate opportunity to be heard.

## VI. *Attorney's Fees.*

 To keep the length of the trial to a minimum, both parties agreed to stipulate to reasonable attorney's fees in the event that either party prevailed on a theory that would allow such an award. At the conclusion of the trial, the only claim upon which the plaintiffs would have been entitled to attorney's fees was the breach of contract claim involving the defendants' failure to pay on its promissory note. *See* Texas Civ.Prac. & Rem.Code § 38.001(8) (Vernon 1986). The note upon which 1488 sued, however, contained a clause limiting the amount of attorney's fees to ten percent of the principal and interest outstanding on the note.[6] We view this limiting provision as a contractual agreement and do not interpret the later stipulations to have overridden this agreement. Had the plaintiffs been awarded attorney's fees on any other claim, the stipulations may have come into play. As it stands, however, the attorney's fees must be limited as defined by the terms of the promissory note. On remand, the district court should recalculate attorney's fees and interest to conform with the requirements provided for in the promissory note.

In its final judgment, the district court also listed the amount of attorney's fees to which the parties had stipulated in the event that such fees were awarded by this court or the United States Supreme Court. The listing, however, incorrectly recorded the stipulations. This listing was unnecessary since the stipulations were preserved in the record. On remand, the district court should simply eliminate this section from its judgment.[7]

---

**5.** Our holding in this case does not undermine previous findings of this court that, in particular circumstances, Rule 11, standing alone, will constitute sufficient notice of an attorney's responsibilities. *See Spiller v. Ella Smithers Geriatric Center*, 919 F.2d 339, 346 (5th Cir.1990).

**6.** In relevant part, the promissory note stated as follows:

IF DEFAULT BE MADE on this note and of the same be placed in the hands of an attorney for collection, or if collected by suit or foreclosure be had hereon, TEN PERCENT (10%), shall be added to the principal and interest hereof and thereon, still unpaid, as Attorney's or collection fees.

Plaintiff's Exhibit 55 at 1.

**7.** In its cross appeal brief, the plaintiff has argued that the district court erred in directing verdicts against it on the claims of common enterprise and fraud with regard to the promissory note signed by Athona. An Appellee may advance arguments in support of a judgment, even arguments such as these, which previously have been rejected by a district court. *See Hoyt*

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's determinations on all issues rendered by it with the exception of its findings concerning Rule 11 sanctions and attorney's fees. We REMAND these latter issues to the district court for further proceedings consistent with this opinion. In addition, we VACATE the jury award of exemplary damages.

_R. Matise Co. v. Zurn,_ 754 F.2d 560, 565 n. 5 (5th Cir.1985); 15 C. Wright, A. Miller & E. Cooper, _Federal Practice and Procedure_ § 3904 at 415 (1976 & Supp.1990). We find it unnecessary to review the plaintiff's common enterprise theory for disregarding the corporate entity given that the same result is achieved by the jury's finding that Athona was the alter ego of Philsec and AIFL. With respect to the plaintiff's second argument regarding fraud on the promissory note, we find that the district court correctly directed a verdict against the plaintiff. The plaintiff failed to present sufficient evidence to create a question for the jury.