**FEDERAL SAVINGS AND LOAN IN-SURANCE CORPORATION in its Capacity as Receiver for Franklin Savings Association, Plaintiff,**

**Federal Deposit Insurance Corporation, Statutory Successor to Federal Savings and Loan Insurance Corporation, Plaintiff–Appellee,**

v.

**TEXAS REAL ESTATE COUNSELORS, INC., et al., Defendants–Appellants.**

No. 90–8534.

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1992.

Patricia Montgomery, Davis & Wilkerson, Austin, Tex., for defendants-appellants.

Joel Brenner, Storch & Brenner, Washington, D.C., amicus for Appraisal Institute, and others.

William S. Warren, III, Mark S. Cruzcosa, Pope, Hopper, Roberts & Warren, Austin, Tex., for plaintiff-appellee.

Michael H. Krimminger, Robert D. McGillicuddy, FDIC, Washington, D.C., for FDIC.

Before POLITZ, Chief Judge, and KING and JOHNSON, Circuit Judges.

KING, Circuit Judge:

Texas Real Estate Counselors, Inc. ("TREC") appeals from the district court's judgment holding it fifty-one percent responsible for damages resulting from a negligent appraisal of real estate. It contends that (1) the three grounds of negligence found by the district court are clearly erroneous; (2) the district court erred in calculating the plaintiff's damages; and (3) the district court abused its discretion in awarding prejudgment interest at the rate of ten percent per annum. For reasons set forth below, we vacate the judgment of the district court and remand the case for recalculation of the apportionment of responsibility for the negligence.

## I. BACKGROUND

In 1984, Manninko, Inc. ("Manninko"), a corporation wholly owned by Lawrence Mann, purchased from Franklin Savings Association ("FSA") a lakefront residence on Tortuga Trail in Austin, Texas. Manninko executed a promissory note and deed of trust to FSA, and Mann personally guaranteed the note. Manninko defaulted on the note at a time when the unpaid principal balance was approximately $250,000. In preparation for foreclosure, FSA asked TREC to perform a limited scope appraisal on the property.[1] In March 1987, Bill McConnico, an independent contractor for

---

1. A limited scope appraisal, also known as a "windshield" or "drive-by" appraisal, differs from a full appraisal in that, instead of entering the property and inspecting both the interior and exterior of the structure, the appraiser observes it from the street and prepares a report based on his observations and other information. Although TREC generally charged approximately $150 to perform a limited scope appraisal of a private residence, it charged FSA $500 to conduct the limited scope appraisal of this property because of its value and unique characteristics.

TREC, performed the limited scope appraisal on the property and provided FSA with a written report.

Ostensibly for the purpose of assisting TREC in preparing the report, FSA supplied TREC with two full appraisal reports prepared in 1984 and 1985 by appraisers who had inspected the property. McConnico used information from these reports in compiling his report. The 1985 appraisal estimated the property's value at $1 million "conditional upon the satisfactory completion of the current remodeling taking place." Without verifying that statement,[2] McConnico assumed that the remodeling had actually been completed in estimating the "effective age"[3] and the current value of the property. McConnico's report estimated the effective age of the property at three years, and set its value at $1.2 million. C. Jack Mazuk, a review appraiser at TREC, briefly viewed the property and reviewed the information that McConnico compiled. The text of the report explained that it was prepared based on a cursory inspection of the exterior and visual construction components, and market research and analyses. However, TREC's report did not disclose that the assumption as to remodeling was based on unverified data in the 1985 appraisal report. Mazuk and McConnico signed and delivered this report to FSA.

On April 1, 1987, FSA met with Mann and used the estimated value of the property to establish an agreed deficiency of $25,000. Later that month, FSA bought the property at the foreclosure sale for $921,290.27. The property remained vacant for approximately nine months. During this time, FSA left the property unsecured, and made no effort to repair or improve it. Transients camped out in the property, and some appliances were taken. The real estate market continued to decline during this period. In March 1988, FSA obtained a listing agent and, two weeks later, an earnest money contract was signed for $350,000. The property was sold for this amount on June 30, 1988.

After the sale, FSA sued TREC, alleging that TREC's negligent performance of the appraisal caused it to purchase the property for much more than it actually was worth. FSA became insolvent and the FDIC ultimately succeeded to FSA's rights in the lawsuit.[4] After a two-day bench trial, the court entered findings of fact and conclusions of law in which it determined that TREC was negligent in three ways: (1) it failed to verify completion of the alleged improvements to the property; (2) it failed to base its estimate of effective age on verified data; and (3) it "agreed to accept an assignment to perform a windshield appraisal of the property under the circumstances...." The court found that TREC's negligence proximately caused damages to FSA in the amount of $596,290.27, but found that FSA was forty-nine percent contributorily negligent in requesting a windshield appraisal under the circumstances. The court entered judgment in favor of TREC for $304,108.04,[5] plus postjudgment interest. In a separate order, the court granted prejudgment interest at the rate of ten percent from April 7, 1987 until the date of the judgment. TREC appeals from the judgment, contending that (1) the district court clearly erred in making all three findings of negligence; (2) the FDIC failed to state a claim for negligent misrepresentation; (3) the district court erred in determining the proper amount of damages; and (4) the district

2. FSA had advised TREC that TREC could not enter the property or inspect its interior because FSA did not receive permission to do so from the individuals who were leasing the property from Mann. TREC complied with this instruction.

3. Effective age is an estimate of the age of a house after taking into account remodeling and other renovations that counter the natural deterioration of a property over time, thus effectively "reducing" its age.

4. The suit originally was filed by FSA in state court, but in 1988, when the FSLIC succeeded to FSA's claim, the case was removed to federal court pursuant to 28 U.S.C. § 1446 and 12 U.S.C. § 1730(k). Texas law applies. *See* 12 U.S.C. § 1730(k), *repealed by* Pub.L. No. 101–73, 103 Stat. 363 (Aug. 9, 1989).

5. This amount represents 49% of its damages minus the $25,000 settlement from Mann.

court erred in awarding prejudgment interest at a rate of ten percent. We address each of these issues below.

## II. DISCUSSION

### A. Negligence

■ TREC challenges the district court's finding that it acted negligently on all three grounds. In an action for professional negligence in Texas, the question whether a defendant owes a duty to the plaintiff is a question of law, *Greater Houston Transportation Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990), but whether the duty was breached—that is, whether the defendant failed to adhere to the applicable standard of care—is a question of fact. *Rudolph v. ABC Pest Control, Inc.*, 763 S.W.2d 930, 933 (Tex.App.—San Antonio 1989, error denied); *see also McGonigal v. Gearhart Indus., Inc.*, 788 F.2d 321, 326 (5th Cir.1986) (standard of care is question of law, while negligence is for factfinder) (applying Texas law). Those findings of fact are governed by the "clearly erroneous" standard. Fed.R.Civ.P. 52(a); *Beck by Chain v. Thompson*, 818 F.2d 1204, 1208 (5th Cir.1987).

■ Under this standard, a finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see also Lewis v. Timco, Inc.*, 736 F.2d 163, 166 (5th Cir.1984). But, when review of the record as a whole reveals evidence from which the district court plausibly could have reached its conclusion, we may not reverse even though we are convinced that, if sitting as the trier of fact, we would have weighed the evidence differently. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). "Where there are two plausible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. at 1511 (citations omitted). The clearly erroneous standard applies to the factfinder's conclusion, after hearing expert testimony, about whether a person violated the applicable standard of care. *See King v. Flamm*, 442 S.W.2d 679, 681 (Tex.1969); *Burks v. Meredith*, 546 S.W.2d 366, 370 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n.r.e.).

■ TREC argues on appeal that the plaintiffs failed to prove any of the legal elements of a professional negligence action. In Texas, actionable negligence requires the existence of a legal duty owed by one person to another, a breach of that duty, and damages proximately resulting from breach of that duty. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987). While all individuals owe a duty to exercise reasonable care to avoid foreseeable injury to others, professionals, by virtue of their special skill and expertise, are held to a higher standard of reasonable care. *See Mobil Pipe Line Co. v. Goodwin*, 492 S.W.2d 608, 613 (Tex.Civ.App.—Houston, 1972, writ ref'd n.r.e.). The duty owed by a professional to his client derives from their contractual relationship and requires that the professional "use the skill and care in the performance of his duties commensurate with the requirements of his profession." *I.O.I. Systems, Inc. v. City of Cleveland, Texas*, 615 S.W.2d 786, 790 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Liability attaches only for failure to exercise reasonable care and skill in accordance with those requirements. *Id.; see also Ryan v. Morgan Spear Assocs., Inc.*, 546 S.W.2d 678 (Tex. Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.). Although no Texas case sets forth the standard of care owed by real estate appraisers, the parties agree that the same general standards that have been applied to such professionals as architects, engineers, and physicians apply here.[6]

---

6. Other courts have held appraisers to the same standard of due care to which professionals normally are held. *See Federal Savings & Loan Ins. Corp. v. Derbes*, 731 F.Supp. 755, 762 (E.D.La.1990) (Louisiana law); *Hoffman v. Greenberg*, 159 Ariz. 377, 767 P.2d 725, 728 (App.1988).

The district court apparently rested its conclusion that TREC was negligent on the same findings it articulated in its discussion of FSA's contributory negligence. In concluding that FSA was contributorily negligent, the district court found that the property was unique, and that although both parties were aware that interior remodeling had commenced, they had no knowledge of the extent to which it had been completed and knew that they would be unable to inspect the interior of the property. The record supports these findings. We conclude that the district court's findings of fact comply with Federal Rule of Civil Procedure 52(a), and are not, as TREC suggests, impermissibly vague. So, we address TREC's claim by examining whether the record supports each finding of negligence.

### 1. *Negligent failure to verify*

■ TREC first challenges that the record does not support the district court's findings that (1) TREC failed to verify completion of the alleged improvements to the property; and (2) TREC failed to base its estimate of effective age on verified data. Since both of these findings concern breach of a common duty, we address them together. TREC asserts that its actions should not be deemed negligent because the industry permits limited scope appraisals in which verification is not necessary and TREC fully disclosed the limited nature of the appraisal in its report. In short, TREC asserts that no absolute duty to verify exists because the industry standards do not require verification.

7. The Code of Professional Ethics ("C.P.E.") and Standards of Professional Practice ("S.P.P.").

8. The Standards of Professional Practice and Conduct ("Standards," "Standards Rules," or "S.R.").

9. The Appraisal Institute, the American Institute of Real Estate Appraisers, and the Society of Real Estate Appraisers, as amici, argue that federal law supplies the standard of care through the application of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). They urge us to reverse and remand so that the district court can apply this federalized standard of care to the facts of the case. Since (1) the record below contains no

■ Although the district court did not make an explicit holding as to the specific standard of care applicable to real estate appraisers, both parties provided the district court with sets of professional ethics and standards from the American Institute of Real Estate Appraisers,[7] and the Society of Real Estate Appraisers[8] to guide the district court in determining the scope of a real estate appraiser's duty.[9] These standards require an appraiser to "communicate each analysis, opinion and conclusion in a manner that is not misleading." Standard 2. The "not misleading" requirement obligates an appraiser either to verify the information upon which he relies, or reveal that he is making specific assumptions based on unverified data. *See* S.R. 2–3 ("Each written or oral report or communication concerning the results of an appraisal must clearly and accurately disclose any extraordinary assumption or limiting condition that directly affects an appraisal analysis, opinion, or conclusion."); S.P.P. 1.1610 (an appraisal analysis must contain an explanation of assumptions and limiting conditions, and indicate their impact on the value estimate).

The district court found that TREC negligently calculated the effective age and estimated value of the property solely because it failed to verify the extent to which remodeling had been completed.[10] However, although the district court's language does not reflect it, the professional standard includes an *alternate* duty to disclose reliance on unverified data.[11] TREC could

evidence of the federalized standard and (2) neither party makes this argument on appeal, we decline to reach this issue.

10. The record indicates that even without access to the property, TREC could have attempted to verify the extent to which the remodeling had been completed by checking with the contractors who did the work.

11. *See* S.P.P. 1.330 ("It is unethical for an appraiser to base the value conclusion upon the assumed completion of public or private improvements *unless he/she clearly defines the conditions, extent and effects of such assumption....*"); Comment to S.R. 2–3 ("This rule requires a clear and accurate disclosure of any

have complied with professional standards and cured the misleading nature of its estimates had it revealed its reliance on the unverified statement in the 1985 appraisal. *See* S.R. 2–3. Nevertheless, without verifying the extent to which the remodeling had been completed, or indicating that its conclusions were based on unverified data, the report stated that the property had "been completely remodeled and updated." As a consequence of this assumption, the report concluded that the effective age of the home was approximately three years, and valued the property at $1.2 million.

In fact, the record contains unrefuted evidence that the first floor of the home had not been substantially renovated, and that some of the renovation had been abandoned before it was completed. This proof of partial renovation falls short of the "complete remodeling" represented by the TREC appraisal. TREC's failure to verify the extent of remodeling or disclose that it had not done so rendered misleading its effective age estimate and its calculation of the property's estimated value. As the district court found, FSA foreseeably relied on the valuation contained in TREC's report in negotiating the foreclosure deficiency agreement with Lawrence Mann, and this reliance operated to FSA's detriment.

In summary, the district court found that TREC was negligent when it (1) "failed to verify completion of the alleged improvements in the property," and (2) "failed to base [its] estimate of the effective age of the property on verified data." We think that the record fairly supports the district court's baseline conclusion that TREC was negligent in preparing the report, although we would predicate that negligence on the failure either to verify the alleged completion of improvements on the property, *or* to disclose its reliance on unverified data when it presented the effective age and value estimates.

### 2. *Negligent acceptance of the assignment*

■ TREC challenges the district court's finding that TREC was negligent for accepting the limited scope appraisal assignment under the circumstances. The district court may have premised this finding on the conclusion that TREC breached the ethical obligation embodied in the Comment to Standards Rule 2–7, which declares that "[i]f the limited scope of the appraisal report would tend to mislead or confuse the client, the users of the report, or the public, the appraiser must not enter into such agreement." To support the district court's conclusion that TREC was negligent in accepting the assignment, the record must include some evidence that under the circumstances that obtained here, a professional could not perform a limited scope appraisal on the subject property because to do so would tend to be misleading.[12] Neither party produced evidence that in the circumstances of this case, the report would have been misleading had it contained an explicit disclosure. More importantly, the record contains no evidence that TREC's acceptance of the limited scope appraisal assignment was a cause in fact of FSA's loss. The FDIC alleged only that the appraisal report was

extraordinary assumptions or conditions that directly affect an appraisal analysis, opinion, or conclusion. Examples of extraordinary assumptions or conditions might include items such as ... completion of onsite or offsite improvements."). Expert testimony presented at trial also supports the view that an appraiser must verify the physical condition of the subject property *or disclose* in the appraisal report any assumptions regarding the condition of the appraised property that could not be independently verified.

**12.** S.R. 2–7 states:
An appraiser may enter into an agreement calling for an appraisal report that is some-

thing less, or different from, the complete appraisal report that would otherwise be required by the specific reporting guidelines, provided that prior to entering into such agreement,
(a) the appraiser has determined that the resulting appraisal report would not be so limited in scope that it would tend to mislead or confuse the client, the users of the appraisal report, or the public; *and*
(b) the appraiser has advised the client that the report to be prepared is something less than, or different from, the report required by the specific reporting guidelines and therefore the appraisal report will include a qualification that reflects this fact.

misleading because TREC failed to verify the remodeling data, or disclose that the assumption as to remodeling was based on unverified information. It alleged further that FSA's reliance on the misleading report caused it to negotiate a deficiency agreement at a much lower amount than FSA would have had (1) the TREC appraisers verified the extent of remodeling before making the value and age estimates or (2) the TREC appraisers specifically revealed the reliance on unverified data. As a result, we find that the record does not support the district court's conclusion that TREC was negligent in accepting the assignment "under the circumstances."

Our conclusion that the record does not fairly support the district court's finding that TREC was negligent in accepting a limited scope appraisal assignment under the circumstances requires that we remand this case to the district court to reapportion the fault. Because Texas law does not permit a party to recover on a negligence action if it bears fifty percent or more of the responsibility for the negligence resulting in the loss, a reallocation of fault could result in a take-nothing judgment for FDIC. *See* Tex.Prac. & Rem. Code § 33.001 (Vernon Supp.1991). Accordingly, we vacate the district court's judgment and remand the case so that the court can recalculate the apportionment of responsibility to the parties.[13]

### B. Damages

TREC argues that the district court erred in determining the proper amount of damages. We address this argument in the event that the district court's reapportionment of responsibility continues to result in a judgment in favor of the FDIC. We review the district court's determination of damages under the clearly erroneous standard. *See Neal v. United States*, 562 F.2d 338, 341 (5th Cir.1977). The proper measure of damages is the amount that would put the FDIC in the position that it would have occupied had TREC not acted negligently.

The district court did not actually state what evidence it relied on to fix the true value of the property as of April 1987. In addition to the 1985 and 1986 appraisals, the record contains a February 1988 appraisal, which estimated the value of the property at $350,000. TREC asserts that there was insufficient evidence of the property's true market value at the time of the 1987 appraisal, aside from the appraisal itself, from which the court could calculate damages. TREC specifically argues that the district court erred by ignoring a 1986 appraisal of the property contained in the record, which valued the property at $1,350,000. It also asserts that the district court erred in calculating the April 1987 damages based on a February 1988 appraisal figure because of the decline in market conditions during the ten-month period. That decline, argues TREC, caused the later appraisal to be inadequate evidence of the property's value at the time of the breach.

We hold that it was within the district court's discretion to give more weight to the evidence of the February 1988 appraisal value. The district court apparently chose to accord little or no weight to the 1986 appraisal because the defendants failed to designate the appraiser who prepared it as an expert. The court noted the FDIC's objection to the admission of the 1986 appraisal and that appraiser's testimony, and indicated that it would admit this evidence only because of the more generous admission standard applicable to bench trials.[14] The district court was entitled to

---

**13.** TREC also contends that the FDIC failed to state a claim for negligent misrepresentation. The theory of negligent misrepresentation permits plaintiffs who are not parties to a contract for professional services to impose liability against the contracting professionals. *See Geosearch, Inc. v. Howell Petroleum Corp.*, 819 F.2d 521, 524 (5th Cir.1987). This argument is specious. The FDIC never made a claim for negligent misrepresentation, inasmuch as FDIC's predecessor in interest, FSA, contracted directly with TREC. Because the FDIC could rely on the common law negligence theory to support its claim, we find this argument meritless.

**14.** In *1488, Inc. v. Philsec Investment Corp.*, 939 F.2d 1281 (5th Cir.1991), we upheld a district court's decision to exclude expert testimony

accord the 1986 appraisal evidence as little weight as it so chose. *Cf. 1488, Inc. v. Philsec Investment Corp.*, 939 F.2d 1281, 1288 (5th Cir.1991).

■ We also find that the district court had discretion to base its calculations on the February 1988 appraisal despite the gradual change in market conditions. Texas courts have held that the trial court has discretion to determine whether to admit evidence of value that is remote in time. *Austin Nat'l Bank v. Capital Lodge No. 23*, 558 S.W.2d 947, 950 (Tex.Civ.App.—Austin 1977, no writ). Two appraisal experts testified that Austin real estate had suffered a one-half to two percent decline in value per month in the ten months between the 1987 and 1988 appraisals. The district court recognized the real estate market conditions in the Austin area at that time. To the extent that the district court relied on the 1988 appraisal in calculating the damages, we find that record supports the damages figure arrived at by the court, and that the court did not abuse its discretion by determining the weight to accord testimony relating to property value and market conditions. TREC argues further that the district court erred by not considering the FDIC's failure to mitigate damages in calculating the damage award. TREC maintains that the FDIC was not entitled to recover the decrease in the value of the property allegedly caused by looting and the presence of transients on the property, time passage before listing, the failure to repair the house before listing, and the undervaluation and removal of the greenhouse.

■ TREC bears the burden of showing that the FDIC failed to mitigate its damages. *Tennessee Valley Sand & Gravel Co. v. M/V DELTA*, 598 F.2d 930, 933 (5th Cir.1979), *clarified*, 604 F.2d 13 (5th Cir.1979). The record contains evidence that the FDIC made some repairs to the property before listing. The record shows that the partially completed renovation projects, which were abandoned before the TREC appraisal, left stripped walls inside and rusted wires protruding from the driveway area outside the home. Thus, factors external to the FDIC's duty to mitigate may have also affected the property's sale price. Moreover, TREC did not offer evidence that the FDIC could have sold the property earlier and received a higher price, or that the FDIC could have recovered more from the sale of the greenhouse than it did. Consequently, we hold that the district court did not clearly err in concluding that the FDIC did not fail to mitigate its damages.

■ TREC also contends that the FDIC failed to demonstrate that FSA could have collected from Lawrence Mann the difference between the agreed deficiency payment and the amount it would have agreed to but for TREC's negligence. To prevail in a claim for damages, the plaintiff must show that some part of the claim would have been collectible. *See, e.g., Capital Title Co. v. Mahone*, 619 S.W.2d 204, 207 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). The FDIC presented evidence that between June 1, 1989 and January 4, 1990, Mann paid more than $245,000 in satisfaction of another judgment. Although, as TREC points out, the record also contained evidence that some of Mann's debts went unpaid in 1986, the district court could correctly rely on the evidence of Mann's ability to pay the judgment in determining collectibility. Accordingly, we do not disturb the district court's determination on this ground.

## C. Prejudgment interest award

■ Finally, TREC challenges the district court's award to the FDIC of prejudgment interest at a rate of ten percent. We also respond to this challenge in case the district court's reapportionment of re-

---

from a real estate appraiser concerning the disputed value of property. *Id.* at 1289. We observed that "[d]istrict courts are given broad discretion in determining whether to exclude expert testimony when a party has failed to designate such witnesses in accordance with

pretrial orders." *Id.* at 1288. The district court in this case had the same discretion, but chose to admit the 1986 appraisal evidence in view of the free admissibility of evidence in bench trials.

sponsibility continues to result in a judgment in favor of the FDIC. TREC argues that the court should not have awarded prejudgment interest because it was never specifically requested in the pleadings. However, federal law governs the adequacy of a pleading for prejudgment interest. *Hamman v. Southwestern Gas Pipeline, Inc.*, 821 F.2d 299, 308 (5th Cir.), *vacated in part on other grounds*, 832 F.2d 55 (5th Cir.1987). In addition to enumerated damages, the pleadings requested "any other relief, both special and general, to which it may be justly entitled." Under federal law, this statement suffices to plead a claim for prejudgment interest. *See id.*

TREC alternatively contends that the court erred in awarding prejudgment interest at a rate of ten percent because Texas law provides that prejudgment interest shall be the same as postjudgment interest. The district court assessed postjudgment interest at a rate of 8.32% pursuant to federal law. *See* 28 U.S.C. § 1961 (governing awards of postjudgment interest). State law governs the award of prejudgment interest. *See Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 330–31 (5th Cir.1987). Texas law sets the minimum judgment rate of interest at ten percent. Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 2. However, TREC correctly points out that Texas law requires prejudgment and postjudgment interest to run at the same rate. *See* Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 6(g).

Clearly, these provisions operate harmoniously when the interest awards equal or exceed ten percent. But, because state law cannot supplant the federal postjudgment interest statute, the district court was forced to choose between the application of one or the other provision. In this case, TREC urges, the district court should have limited the prejudgment interest award to 8.32% pursuant to article 5069–1.05 § 6(g) because federal law sets the postjudgment interest at that rate.

Under both the Texas and federal judgment interest rate provisions, the interest calculation begins with the same basic formula. *See* Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 2; 28 U.S.C. § 1961. Texas law, however, includes a floor of ten percent and a ceiling of twenty percent in its judgment interest statute. *See* art. 5069–1.05 § 2.

The Texas statute's difference from the federal formula clearly expresses the intent of the Texas legislature to provide to recovering plaintiffs a minimum ten percent judgment interest rate. Moreover, we are not persuaded that the Texas legislature intended to limit the recipient of a damages award to a prejudgment interest rate of less than the ten percent statutory minimum simply because its case was tried in federal court. Accordingly, we hold that the district court did not abuse its discretion in setting the prejudgment interest rate at ten percent.

### III. CONCLUSION

For the foregoing reasons, we VACATE the judgment of the district court, and REMAND for recalculation of the apportionment of responsibility and entry of judgment. Each party shall bear its own costs.